# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| | : | |
| UNITED STATES OF AMERICA | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | NO. 06-319 |
| VINCENT J. FUMO | : | |
| | : | |

## Memorandum and Order

YOHN, J.                                                                          August___, 2007

The United States filed a motion requesting a hearing regarding possible conflicts of interest faced by the attorneys representing Pennsylvania State Senator Vincent J. Fumo.[1]  The court held an evidentiary hearing on June 25 and 26, 2007 to adduce evidence related to possible conflicts, and heard oral argument on July 10, 2007.  The government then moved to disqualify Fumo's counsel.  For the reasons stated herein, the government's motion to disqualify will be denied, subject to Fumo's adequate waiver of the conflicts of interest faced by his attorneys.

---

[1]The government's original motion also included a request for a hearing regarding the possible conflicts facing counsel of codefendant, Ruth Arnao.  The court held a hearing on June 8, 2007 regarding those potential conflicts and conducted a waiver colloquy with Arnao, wherein she knowingly, intelligently and voluntarily waived any conflict of interest that her counsel may have.  The court accepted Arnao's waivers and denied the government's subsequent motion to disqualify Arnao's counsel.  Arnao's attorneys and the government have since entered into a stipulation concerning testimony by Arnao's counsel.  As such, the portion of the government's motion regarding Arnao is resolved, and this memorandum and order will only address the government's motion as it concerns Senator Fumo.

**I. Procedural History**

The government issued a superseding indictment on February 6, 2007, charging

defendants Fumo, Ruth Arnao, Leonard Luchko and Mark Eister.  Fumo was charged in

connection with four areas of wrongdoing:  (1) fraud and conspiracy to commit fraud related to

the State Senate of Pennsylvania ("Senate"); (2) fraud and conspiracy to commit fraud,

conspiracy to obstruct the Internal Revenue Service, and aiding and abetting in the filing of false

tax returns, related to Citizens Alliance for Better Neighborhoods ("Citizens Alliance "); (3)

fraud related to the Independence Seaport Museum ("ISM"); and (4) obstruction of justice and

conspiracy to obstruct justice.  On April 4, 2007, the government filed a motion requesting a

hearing regarding possible conflicts of interest faced by the attorneys currently representing

Fumo:  Richard A. Sprague, Mark B. Sheppard and Geoffrey R. Johnson, of the law firm of

Sprague & Sprague ("the Sprague firm").  In his response, Fumo contested the government's

factual allegations, but did not oppose such a hearing.  The government filed a reply.

In an effort to define and narrow the contested factual issues related to possible conflicts,

and because Fumo's brief did not directly respond to the government's factual allegations, I

directed Fumo to file a supplemental response either agreeing or disagreeing with each of the

government's factual assertions.  Thereafter, I held an evidentiary hearing to determine what

evidence the government would adduce at trial bearing on possible conflicts of interest faced by

Fumo's counsel.  The government presented four witnesses and entered into the record

approximately forty documents.  The government's witnesses included Jeh Johnson, an attorney

from New York who had occasion to deal with attorneys from the Sprague firm related to this

investigation; Jeff Travelina and John Sfrisi, two Citizens Alliance board members; and Special

Agent Vicki Humphreys, a federal agent who investigated this case and who read into the record portions of the agent interview reports ("302s") and grand jury testimony of other government witnesses. Fumo did not call any additional witnesses but entered into the record several documents, including declarations of witnesses who could be presented at trial.

After the hearing, I directed the government to file proposed findings of fact setting forth the allegations they substantiated at the evidentiary hearing, and to brief whether those facts adduced warranted disqualification of Fumo's counsel or could be cured by a waiver of any conflicts of interest faced by Fumo's counsel. I directed Fumo to submit his own findings of fact in response to the government's submission. The parties presented oral argument on July 10, 2007. At that time, the government moved to disqualify the Sprague firm based on the evidence it had presented during the hearing, which it intended to introduce at trial. The government argued that, given the multitude of conflicts existing, a waiver from Fumo would be insufficient to cure the defect.[2]

---

[2]Fumo has repeatedly contended that the decision to bring the instant motion for disqualification of his counsel is tactically motivated in order to deprive him of his counsel of choice, and that the government has delayed in bringing the motion. I disagree. The government filed its motion for a hearing on the possible conflicts of interest only two months after he was charged in the superseding indictment. Additionally, there are serious issues presented by the government's motion, and the court has "an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." *Wheat v. United States*, 486 U.S. 153, 160 (1988); *see also United States v. Moscony*, 927 F.2d 742, 749 (3d Cir. 1991) (stating that "the court has an independent interest in protecting a fairly-rendered verdict from trial tactics that may be designed to generate issues on appeal"). Accordingly, the court's independent responsibility compels it to address the issues raised in the government's motion even if the motion could have been brought prior to the issuance of the superseding indictment. There has been no evidence whatsoever to support the allegation that the motion was a tactical maneuver by the government to deprive Fumo of his counsel of choice.

## II.  Evidence Presented

The following summarizes the evidence that the parties presented at the evidentiary hearing and in their papers that bears on the issue of conflicts of interest faced by attorneys from the Sprague firm.  For ease of understanding, I have divided the evidence presented into substantive areas, which parallel the four sets of crimes alleged in the indictment.

### A. Evidence Related to the Senate

#### 1. The Sprague Firm's Representation of Senate Entities

The Sprague firm was retained to represent the State Democratic Appropriations Committee ("SDAC") and the Senate Democratic Computer Services ("SDCS"),[3] effective February 18, 2005, which representation lasted through February 6, 2007.  (Gov't Ex. 34; Def.'s Suppl. Resp. ¶ 12.)  The Sprague firm also represented the Office of Fumo and Fumo in his official capacity.  (Def.'s Suppl. Resp. ¶ 12.)  The Service Purchase Contract states that the Sprague firm's legal representation of the two entities is "in connection with federal court proceedings pertaining to the seizure and recovery of property."  (Gov't Ex. 34.)  A letter attached to the Service Purchase Contract states as follows:

> The services provided would include the preparation, constitutionality and legality of the seizure of such property, the providing of legal advice, research and issue analysis.  The legal representation shall be on behalf of the Committee and SDCS, as direct by the Counsel of the Senate Democratic Appropriations Committee and its Chairman, Senator Vincent J. Fumo.

(*Id.*)

The government intends to argue that the fact that the Sprague firm represented the

---

[3]These are groups designated by the Democratic members of the Pennsylvania Senate, a minority party at the time, and whose designated chairman was Fumo.

SDAC and the SDCS during this time has evidentiary value.  (Gov't's Proposed Finding of Fact ¶ 11.)  This is because the Sprague firm's representation was contemporaneous with the time period during which the government alleges that Fumo and others destroyed pertinent emails and documents in order to obstruct the federal investigation.  (*Id.* ¶ 11.)  Agent Humphreys testified that she executed a search warrant for email evidence and served a grand jury subpoena for Fumo's Tasker Street office, on February 18, 2005, copies of which she gave to Charlie Hoffman, Fumo's Chief of Staff.  (Tr. 6/25/07 p.m. at 126-29.)  Donald Wilson, a SDCS computer technician assigned to Fumo's Philadelphia office, testified before the grand jury that after the search warrant was executed, he and others did not immediately stop deleting email and wiping the contents of computers because no one had told them otherwise; in other words, for the next six weeks there were no changes.  (*Id.* at 133.)  On April 20, 2005, in an email to Luchko, Eister states that Sheppard told them to retain and archive all emails.  (Gov't Ex. 30; Tr. 6/25/07 p.m. at 138.)  At some point after the initial six weeks, Hoffman raised concerns about the deleting and wiping and, around July 2005, all the emails were to be backed up, burned onto a DVD, and sent to the Harrisburg server.  (Tr. 6/25/07 p.m. at 135-36.)

Also during the Sprague firm's representation of the SDAC and the SDCS, the government obtained voluminous amounts of discovery, including emails, documents and computers.  (Def.'s Proposed Findings of Fact ¶ 111.)  Additionally, there was a potential effort to reconfigure the server in Harrisburg in order to delete email prospectively; that reconfiguration was never implemented.  (Tr. 6/26/07 at 49-51.)  No evidence was presented implicating any member of the Sprague firm in any of the alleged wrongdoing or suggesting that they in any way knew of the destruction of documents.  (*Id.* at 14; Tr. 7/10/07 at 16-17.)

W. Russell Faber is the Chief Clerk of the Senate.  (Gov't's Proposed Findings of Fact ¶ 13; Def.'s Proposed Findings of Fact ¶ 100.)  On March 30, 2005, Faber reviewed the engagement contract for the provision of legal services by the Sprague firm to determine whether it conformed with the Financial Operating Rules of the Senate.  (Def. Ex. 10.)  He also reviewed billing invoices and vouchers presented for payment for conformity with the Financial Operating Rules of the Senate, prior to their submission to the Pennsylvania Treasury Department for payment.  (*Id.*)  The invoice from the Sprague firm for the final services rendered under the contract contained only services dated prior to the indictment of Fumo.  (*Id.*)  Pursuant to this contract, the Senate paid the Sprague firm approximately $1.22 million in legal fees.  (Tr. 6/25/07 p.m. at 160.)  Faber was not and is not represented by the Sprague firm in either his individual or official capacity.  (Def. Ex. 10; Gov't's Proposed Findings of Fact ¶ 14; Def.'s Proposed Findings of Fact ¶ 100.)  Faber is employed by and responsible to the entire Senate, not Fumo, and he has retained his own counsel for purposes of this investigation.  (Def. Ex. 10; Gov't's Proposed Findings of Fact ¶ 14; Def.'s Proposed Findings of Fact ¶ 100.)  The government intends to call Faber as a witness to testify regarding the standard purposes for which contractors may generally be paid by the Senate.  (Gov't's Proposed Findings of Fact ¶ 13.)

The government has represented that it intends to call as witnesses members of the SDAC and the SDCS staff in order to prove allegations contained in the indictment.  (*Id.* ¶ 10; Tr. 6/25/07 p.m. at 159-60.)  The Sprague firm did not represent any of those employees in their individual capacities.  (Gov't's Proposed Findings of Fact ¶¶ 9-10; Def.'s Proposed Findings of Fact ¶¶ 104, 107-08; Tr. 6/26/07 at 7-8 (regarding Christopher Craig and Deborah Maguire).)  Nor has the Sprague firm represented the Senate as an entity.  (Def.'s Proposed Findings of Fact

6

105; Def. Ex. 10.)

The Senate, through its counsel, C. Clark Hodgson Jr., has stated that it takes no position with respect to the suggested actual or potential conflict.  (Gov't's Proposed Findings of Fact ¶ 19; Def.'s Proposed Findings of Fact ¶ 109.)

**2. Fumo's Use of Senate Employees**

At the evidentiary hearing, the government produced evidence that it intends to introduce at trial suggesting that Fumo used Senate employees for improper purposes, which situations directly or tangentially involved the Sprague firm.  The government produced evidence that it intends to introduce at trial that in July 2000, Fumo directed Senate-employed computer technicians to call Sprague at a London hotel in order to assist him in configuring his laptop to obtain a dial-up internet connection.  (Gov't Ex. 35.)  Email communications between Fumo and the computer technicians began on Thursday, July 27, 2000, at 1:47 p.m., and continued throughout the weekend.  (*Id.*)  It was not established how long the actual assistance to Sprague lasted.  (Tr. 6/26/07 at 53.)

A Senate-employed computer technician, Mike Podgorski, was directed to assist Sprague's computer technician in setting up a wireless router at Sprague's house.  (*Id.* at 162.) This assistance was provided at a time when Fumo was convalescing at Sprague's house after undergoing surgery, and the wireless router was installed for Fumo's use.  (Tr. 6/25/07 p.m. at 162; Tr. 6/26/07 at 54; Def. Ex. 13.)

Fumo requested that attorneys from the Sprague firm, Joseph McAlee and Charles Hardy, work with a Senate employee, Christopher Craig, in 2001, to resolve a business dispute with AT&T on behalf of Fumo's girlfriend and her employer.  (Tr. 6/25/07 p.m. at 164; Gov't Ex. 36.)

Attorneys from the Sprague firm then provided assistance.  (Gov't Ex. 36.)

Senate employees, referred to in the indictment as Person Number 24 and Person Number 25, delivered shirts belonging to Fumo to Sprague's home for laundering.  (Def.'s Suppl. Resp. ¶¶ 85-86.)

Frank Wallace, referred to in the indictment as Senate Contractor Number 1, was a private investigator, under contract with the Senate, who performed personal and political tasks for Fumo.  (Gov't's Proposed Findings of Fact ¶ 76.)  Wallace testified at the evidentiary hearing that he conducted sweeps for electronic listening devices on behalf of Fumo at Fumo's Tasker Street office, Fumo's farm in Harrisburg, Fumo's home in Philadelphia, the offices of two City Councilpersons, Citizens Alliance's office, and Ruth Arnao's home.  (Tr. 6/25/07 a.m. at 45-49.)  At some point, Wallace voiced his concern to Hoffman about the propriety of the sweeps.  (*Id.* at 49.)  Hoffman told Wallace that Sprague said that it was, in Wallace's words, "perfectly all right for [Wallace] to do the sweeps."  (*Id*. at 50.)  Wallace then told Hoffman that if Sprague would put his advice in writing that Wallace would continue with the sweeps.  (*Id.* at 50, 63.)  Wallace's belief is that all parties involved understood sweeps as including all of the locations.  (*Id.* at 64.)  Sprague's position is that he advised that a sweep for electronic listening devices in Fumo's office was permissible.  (Def.'s Proposed Findings of Fact ¶ 140; Def.'s Suppl. Resp. ¶ 110.)  Wallace also reported that Fumo told him that Sprague had advised that PAC money could be used to purchase more sophisticated equipment to employ in the sweeps.  (Def.'s Proposed Findings of Fact ¶ 140; Def.'s Suppl. Resp. ¶ 110.)

Wallace retained counsel in connection with a grand jury subpoena that was issued to him.  (Tr. 6/25/07 a.m. at 52.)  Wallace spoke with Sheppard regarding Wallace's choice of

counsel, at which time Sheppard suggested Wallace retain William DeStefano, who was already familiar with the investigation.  (*Id.* at 57; Def.'s Suppl. Resp. ¶ 111.)  Wallace understood that Sheppard wanted Wallace to be a part of the mutual defense agreement already in existence between potential targets of the investigation.  (Tr. 6/25/07 a.m. at 54.)  Wallace told Sheppard that Wallace preferred his own attorney, Frank DiSimone.  (*Id.* at 54, 57-58.)  Hoffman informed Wallace that although the standard practice of the Senate was to pay attorney fees for a Senate employee in connection with an investigation concerning Senate duties prior to any indictment, it could not do so in his case because he was an independent contractor, not an employee.  (*Id.* at 53.)

## B.  Evidence Related to the ISM

### 1.  Fumo's Use of and Payment for Yacht

Evidence that the government intends to present at trial suggests that the Sprague firm played a role in Fumo's reimbursement of the ISM for a chartered yacht.  In 2001, the ISM arranged and paid for Fumo's use of a chartered yacht, *Sweet Distraction*.  (Gov't's Proposed Findings of Fact ¶ 67; Def.'s Proposed Findings of Fact ¶ 94.)  In the spring of 2004, the FBI served a grand jury subpoena on the ISM.  (Tr. 6/25/07 p.m. at 139.)  Special Agents Kathy McAfee and Humphreys reviewed the ISM documents potentially responsive to the subpoena, which were then copied by the ISM's counsel, William T. Hill of the Beasley Firm, and subsequently returned to the agents.  (*Id.* at 139-40.)  In April 2004, the agents discovered a letter requesting payment for the charter of the yacht, dated September 12, 2001, from Carter to Fumo, which they requested be part of the documents produced.  (*Id.* at 141.)  After the agents alerted Hill to the letter, Hill contacted his boss, James R. Beasley Jr., who then advised Sprague of the

9

document.  (*Id.* at 144-45.)  Hill subsequently personally spoke to Sprague about the matter.  (*Id.* at 154.)  Hill learned from Sprague that Sprague had determined that it was improper for Fumo not to have paid for the charter, and that Sprague had advised Fumo that Fumo should reimburse the ISM for the cost of the charter, which Fumo did thereafter by check dated April 15, 2004.  (*Id.* at 145; Def.'s Proposed Findings of Fact ¶ 94; Gov't Ex. 31.)  Hill sent a letter to Agent Humphreys providing her with the following records relating to the charter: (1) the September 12, 2001 letter from Carter to Fumo requesting payment for the charter of the yacht,[4] which had inadvertently been left out of the packet of documents provided to her earlier; (2) a memorandum dated April 16, 2004 from Carter to Carol McMahon of the ISM accounting department, directing McMahon to apply a repayment check from Fumo's office for the repayment of the yacht; and (3) a copy of the repayment check for $13,375.  (Gov't Ex. 31; Tr. 6/25/07 p.m. at 140-43.)

### 2. The Sprague Firm's Representation of the ISM

In March 2004, after media interest regarding the ISM's expenditure of funds on a residence for its former president, John Carter, and Fumo's use of yachts owned by the ISM, the ISM retained the Sprague firm for the purpose of media relations.  (Gov't's Proposed Findings of Fact ¶ 64; Def.'s Proposed Findings of Fact ¶¶ 89-90; Def.'s Suppl. Resp. ¶¶ 50-52.)  Over the course of several months, the Sprague firm charged over $25,000 in legal fees for the services of Sprague, Johnson and Sheppard.  (Def.'s Suppl. Resp. ¶ 52; Gov't's Proposed Findings of Fact ¶ 64.)  The Sprague firm ceased representing the ISM on May 19, 2004, when it became evident that the government was investigating matters relating not only to the ISM but also to Fumo.

---

[4]The authenticity of this letter is disputed.

(Def.'s Suppl. Resp. ¶ 54; Gov't's Proposed Findings of Fact ¶ 65.)  Thereafter, attorneys from the Beasley Firm represented the ISM in connection with the investigation.  (Def.'s Proposed Findings of Fact ¶ 92; Tr. 6/25/07 p.m. at 139, 144.)  Howard L. Meyers, counsel for the ISM, has advised that the ISM does not have sufficient information to take a position on the issue of a waiver of any conflict of interest because Carter was responsible for the retention of the Sprague firm and the ISM has a new president and a new board of directors.  (Gov't's Proposed Findings of Fact ¶ 66; Def.'s Proposed Findings of Fact ¶ 95.)

## C. Evidence Related to Citizens Alliance

### 1. The Sprague Firm's Representation of Citizens Alliance

The government intends to argue at trial that the fact that Sprague attorneys were counsel for Citizens Alliance has evidentiary value, in that it alleges Fumo installed his favored attorneys for the purpose of controlling Citizens Alliance.  (Gov't's Proposed Findings of Fact ¶ 20; Def.'s Proposed Findings of Fact ¶ 18.)  Fumo contests these allegations and argues that evidence has been adduced from which the opposite inference should be drawn.  (Def.'s Proposed Findings of Fact ¶ 18.)  The government intends to call as witnesses each of the persons who were members of Citizens Alliance's board during the time that the Sprague firm represented Citizens Alliance. (Gov't's Proposed Findings of Fact ¶ 23.)

The Sprague firm represented Citizens Alliance in some capacity from February 3, 2000 through May 6, 2006, and was paid $247,470 in legal fees.  (Gov't Ex. 40.)  From at least December 2003, the Sprague firm was retained to provide consultation and advice regarding corporate matters.  (Def.'s Proposed Findings of Fact ¶ 18; Tr. 6/25/07 p.m. at 9.)  The scope of services provided concerned matters such as compensation for the Executive Director, Citizens

Alliance's contribution goals, financial issues including the investment of Citizens Alliance's funds and the formulation of a policy for grant and loan requests, the disposition of real property, the termination of a Citizens Alliance employee for misconduct, and the nature of Citizens Alliance's corporate governance.  (Gov't Ex. 18, 19; Tr. 6/25/07 a.m. at 78, 91, 93-96, 100, 102-104; Tr. 6/25/07 p.m. at 8-9.)  According to the board minutes, in one specific instance, at a meeting on December 30, 2004, the Citizens Alliance board agreed to designate Sprague firm attorney Johnson to be its spokesperson with respect to a $333,333.33 loan related to the "Welcome America" program in Philadelphia.  (Gov't Ex. 19.)  In another board meeting, January 29, 2004, according to the minutes:  "There was a discussion about the Executive Director's salary.  Steve Kobasa [an accountant for Citizens Alliance] reported that a comparable salary would be $150,000.  Mr. Johnson agreed that it is reasonable and appropriate."  (Gov't Ex. 18.)  The government asserts that this salary increase was undertaken at the same time Arnao, the Executive Director of Citizens Alliance, was being removed from the Senate payroll.  (Gov't's Proposed Findings of Fact ¶ 37.)  At least two Citizens Alliance board members who testified at the evidentiary hearing were aware that the Sprague firm represented Fumo in connection with the investigation and knew that Johnson was an attorney with the Sprague firm.  (Tr. 6/25/07 a.m. at 8, 15, 40.)  One board member specifically stated that Johnson never asked him to do anything he felt uncomfortable with or that was not in the best interests of Citizens Alliance.  (*Id.* at 23.)

    In addition to Johnson, Citizens Alliance also retained a number of other advisors and attorneys to represent the entity.  When FBI agents Humphreys and McAfee were at the Citizens Alliance office to serve the first grand jury subpoena on Citizens Alliance, which was accepted

by Arnao, in April 2004, Arnao contacted Johnson. (Tr. 6/26/07 at 19-20.) He advised the FBI

agents that Arnao was represented by counsel and that they should not attempt to interview her.

(*Id.*) Citizens Alliance then retained William Winning of Cozen O'Connor in early May 2004 to

respond to the subpoena on behalf of Citizens Alliance and provide legal counsel with respect to

the investigation. (Tr. 6/25/07 p.m. at 6; Tr. 6/26/07 at 20.) At a board meeting on December 16,

2004, Johnson explained to the Citizens Alliance board that, due to a conflict, he could not

represent Citizens Alliance in connection with the criminal investigation, and advised the board

that Winning was Citizens Alliance's counsel with respect to the investigation and should be

invited to subsequent board meetings. (Gov't Ex. 19; Tr. 6/25/07 a.m. at 107; Tr. 6/25/07 p.m. at

6-8.) As such, Citizens Alliance board members were aware of the reason for the retention of

Winning and of the division of responsibilities between Johnson and Winning. (Gov't Ex. 19;

Tr. 6/25/07 p.m. at 6-8.) Accordingly, during board meetings, when questions arose regarding

the investigation, Johnson would defer to Winning. (Tr. 6/25/07 at 7.) Winning, in turn, hired

Joseph Lundy, an experienced tax attorney, to advise Citizens Alliance with respect to issues

involving taxes and Section 501(c)(3) of the Internal Revenue Code. (Tr. 6/26/07 at 20-22.)

When questions concerning tax issues were raised at board meetings, it was Lundy who was

responsible for answering them. (Tr. 6/25/07 p.m. at 44-45.) Lundy, in turn, played a significant

role in discussions and negotiations with Citizens Alliance's auditors and its accountants, from

the accounting firm of Stockton Bates, regarding the preparation of Citizens Alliance's 2003

Form 990 for the IRS. (Tr. 6/26/07 at 20-22.) No evidence was adduced that Johnson played a

significant role with respect to negotiations and discussions with Stockton Bates, or in matters

involving the Form 990. Additionally, Lisa Petkun, of Pepper Hamilton LLP, has represented

13

Citizens Alliance since 1999 in connection with its non-profit compliance and tax matters.  (*Id.* at 41-43; Def. Exs. 4, 12.)  Throughout 2005 and 2006, Johnson continued to represent Citizens Alliance providing advice regarding corporate matters.  He also attended discussions concerning the criminal inquiry.  (Gov't Exs. 18, 19; Tr. 6/25/07 a.m. at 107; Tr. 6/25/07 p.m. at 39.)  Board meetings were also attended by other counsel.  (Tr. 6/26/07 at 23.)

**2. The Sprague Firm's Involvement in the Ratification of Past Expenditures**

In a series of newspaper articles beginning on November 16, 2003, Philadelphia newspapers reported on donations made by PECO energy company to Citizens Alliance in connection with a settlement of litigation initiated by Fumo, some of which questioned the propriety of such payments.  (Gov't Exs. 1-14.)  Prior to January 24, 2004, none of the media reports concerning Citizens Alliance referenced any federal investigation.  (Tr. 6/26/07 at 11-12.) According to Ken Snyder, media consultant and press spokesperson for Fumo, Fumo monitored the news coverage on a "minute by minute basis."  (Tr. 6/25/07 p.m. at 62-63.)  On January 24, 2004, the *Philadelphia Inquirer* reported that the FBI was investigating the matter of Fumo's seeking contributions for Citizens Alliance from Verizon Corp., in connection with the settlement of a regulatory dispute.  (Gov't Ex. 12.)  Snyder took issue with the story because no source had been identified; the article stated that it had relied on two persons who had been interviewed by the FBI.  (Tr. 6/25/07 p.m. at 72-73.)  Snyder prepared a press release announcing that Fumo was seeking reelection.  (*Id.* at 74.)  He characterized Fumo as nonchalant about the article, and explained that Fumo had stated to him that "based on everything the *Inquirer* wrote and the sensational way they wrote it, is not surprising to me that the US Attorney or an FBI agent would want to . . . just find out for themselves.  As a matter of fact, he said the more facts

14

they look at, the better it is for me." (*Id.* at 74-75.) No evidence was presented suggesting that before the January 24, 2004 *Philadelphia Inquirer* article attorneys from the Sprague firm were aware of a federal investigation regarding the expenditures of Citizens Alliance.

In December 2003, the board of Citizens Alliance held its first board meeting. (*Id.* at 76-78; Gov't Ex. 18.) John Sfrisi, a Democratic committeeperson who has known Fumo for a long time and was asked to serve on Citizens Alliance's board in 2002, explained that before this time the board had been very informal and his only information about Citizens Alliance came from Arnao when he ran into her on occasion. (Tr. 6/25/07 a.m. at 73-74.) At the December 2003 meeting, Johnson and Petkun were present as Citizens Alliance's counsel, (Tr. 6/25/07 a.m. at 76-78; 6/25/07 p.m. at 27; Def. Ex. 4), and Steven J. Kobasa, a partner from Stockton Bates, the accounting firm that had prepared Citizens Alliance's consolidated audited financial statements from 1999-2002, was also present. (Def. Ex. 11.) The initiation of board meetings was part of a larger effort to bring Citizens Alliance into corporate compliance, as there had not been board meetings previously. At the December 2003 board meeting, the issue of Unanimous Consents ("consents"), the purpose of which was to ratify Citizens Alliance's expenditures for the years 1991 through 2002, was discussed. (6/25/07 a.m. at 77-79; Tr. 6/25/07 p.m. at 51; Def. Ex. 11.) Petkun drafted the consents as part of a number of actions that were recommended by Pepper Hamilton LLP to bring Citizens Alliance into corporate compliance. (Def. Ex. 4.) It was Sfrisi's understanding that the effort to formalize Citizens Alliance matters came as a result of the investigation. (Tr. 6/25/07 a.m. at 85.) Jeff Travelina, who replaced his deceased mother on the board in 2001, (Tr. 6/25/07 p.m at 24, 42-43), testified at the evidentiary hearing that the formalized actions were to avoid the perception that anyone controlled Citizens Alliance,

including Fumo; although, during his grand jury testimony, he stated that the actions were to

avoid the perception that Fumo controlled Citizens Alliance (*Id.* at 48-50; 59-60). Board

Member Joseph Russo testified that, in part, the formal meetings were initiated as a result of the

*Inquirer*'s articles about Citizens Alliance. (*Id.* at 86.)

The board met again on January 29, 2004. (Gov't Ex. 18; Tr. 6/25/07 a.m. at 86-88.)

Board meeting minutes exist for this meeting and other subsequent meetings. (Gov't Exs. 18,

19.) One board member, Sfrisi, explained that the minutes are not a verbatim record of the

meeting, but rather a summary of what occurred. (Tr. 6/25/07 p.m. at 17-18.) The minutes from

January 29, 2004 contain at least one mistake: they state that the meeting is for "February."

(Gov't Ex. 18; Tr. 6/25/07 a.m. at 88.) According to the minutes, present at the meeting were

board members Sfrisi, Travelina, and Amel Hammad; Al Mezzaroba is not reported as having

been present. (Gov't Ex. 18.) Also reported as having been present are Arnao, Kobasa, Christian

DiCicco and Johnson. (*Id.*) The minutes from the meeting state, in pertinent part, as follows:

> The executive director, Ruth Arnao, reported the following items:
>
> > 2) Mr. Johnson reviewed financial documents including all previous years tax
> > returns, loans, and operating expenses. He concluded that all monies have
> > been properly accounted for and used for their rightful purposes in
> > accordance with the bylaws and mission statement.
> >
> > 3) A package was distributed to board members for ratification, via
> > unanimous written consent, of past financial transactions.

(*Id.*) One board member, Sfrisi, testified that the package of materials presented as back up to

the consents was about eight to twelve inches high. (Tr. 6/25/07 a.m. at 79-80.) Another board

member, Travelina, commented that "it was a lot of paperwork." (Tr. 6/25/07 p.m. at 32.)

At the meeting on January 29, 2004, the board members were asked by Arnao to sign the

16

consents, which had been discussed at the December 2003 board meeting.  (*Id.* at 82-83.)  There is no evidence that anyone from Citizens Alliance's outside auditor, Stockton Bates, raised any objection to the consents at the meeting, or that there was any question raised about expenditures that were reported in the consolidated audited financial statements from 1999-2002, which did not reflect any improper expenditure by Citizens Alliance.  (Def. Ex. 11; Tr. 6/25/07 p.m. at 53; Tr. 6/26/07 at 74-76.)  Although Petkun had prepared the consents, the board minutes do not reflect that she addressed the board regarding these matters or played any role other than preparing these documents; one board member specifically recalled that she had not made any statement to the board.  (Tr. 6/25/07 p.m. at 5-6; Def. Ex. 4; Gov't Ex. 18.)  Sfrisi stated that he was never informed that he was ratifying transactions by Citizens Alliance such as $27,000 for a bulldozer for Fumo, $17,000 for a lawsuit against State Senator Robert Jubelier, or $50,000 for tools for Fumo, but would have asked about them if he had been aware.  (Tr. 6/25/07 a.m. at 119-22.)

The board members signed the consents ratifying in gross all expenditures and tax filings that Citizens Alliance had made during the twelve-year period from 1991 to 2002.  (Gov't Exs. 37, 38; Def. Ex. 4.)  The board members who signed the consents did not review the documents they were being asked to approve and had no understanding of the specific transactions at issue.  (Tr. 6/25/07 a.m. at 79-80; Tr. 6/25/07 p.m. 28-30, 87-88, 99-102.)  Three board members stated that they signed the consents without reviewing the attached documentation because they trusted Arnao and she had told them to do so.  (Tr. 6/25/07 a.m. at 83; Tr. 6/25/07 p.m. at 35, 54, 88.)  Sfrisi specifically testified that he would have signed anything that Arnao asked him to sign, regardless of anything anyone else said, including Johnson, even though he trusted Johnson.  (Tr.

6/25/07 a.m at 94; Tr. 6/25/07 p.m. at 20.)  Travelina testified that he trusted Johnson, but would

have signed the consents regardless of Johnson if Arnao had asked him to do so.  (Tr. 6/25/07

p.m. at 35.)  He stated that he did not believe that Johnson had actually reviewed each and every

transaction for the years in question.  He also stated that it was possible that the statement in the

board minutes concerning materials that Johnson had reviewed could have been in reference to

the audited financial statements prepared by Stockton Bates, which may have been contained in

the package presented to the board members.  (Tr. 6/25/07 p.m. at 52-54.)  One board member,

Mezzaroba, testified that the signature on the consents did not appear to be his, but that he would

have authorized Arnao to sign on his behalf if she had asked.  (*Id.* at 98-100.)

    At the next board meeting, on February 26, 2004, the board minutes again stated as

follows:  "Mr. Johnson reviewed all financial documents including all previous year's tax

returns, loans, and operating expenses.  He concluded that all monies have been allocated for and

used for their rightful purposes in accordance with bylaws and mission statement."  (Gov't Ex.

18.)  The government presented evidence that Johnson was also involved at board meetings by

repeatedly assuring board members that Fumo had no control over Citizens Alliance's

expenditures.  Specifically, Sfrisi testified that Johnson "sternly" told the board that Fumo "has

no authority over how the money is spent."  (Tr. 6/25/07 a.m. at 102-03; *see also* Tr. 6/25/07

p.m. at 10-11.)  In explaining the weight that he gave to Johnson's reassurances, Sfrisi testified,

"I took that as a fact . . . [b]ecause he said it, and he looked—he looked pretty—pretty sure he

meant it."  (Tr. 6/25/07 a.m. at 104.)  Sfrisi's recollection is corroborated by notes he took at one

meeting, which state, "Fumo lobbies $ for C.A., he has no say how it's spent!"  (Gov't Ex. 19.)

When asked how he viewed Johnson's role at monthly board meetings, Travelina stated that

18

Johnson "told us we should take it a little more seriously, that we should concentrate when we're there and make sure if you have any objections or questions that—to just voice them." (Tr. 6/25/07 p.m. at 55.)

It is the government's intention to argue at trial that the Citizens Alliance board's signing of the consents ratifying all past expenditures was knowingly undertaken by Fumo and Arnao to conceal prior fraudulent transactions. (Gov't Proposed Findings of Fact ¶ 36.) Moreover, the government alleges that after the December 2003 and January 2004 board meetings occurred, the fraudulent conduct continued. (*Id.*) Both the government and counsel for Fumo stated that they do not intend to call Johnson as a witness. Counsel for Fumo has stated that, at this time, they do not intend to present an advice of counsel defense. Counsel for Arnao has similarly averred that she does not intend to call Johnson or present an advice of counsel defense.

### 3. The Sprague Firm's Involvement in Transactions Related to Polling Expenditures

Johnson was also involved in a matter concerning Citizens Alliance's payment for certain polling expenditures. In 2002 and 2003, Citizens Alliance and its subsidiary paid for political polling, which Citizens Alliance later determined to be improper.[5] In 2003, auditors from Stockton Bates became concerned with the possibility of improper expenditures made by Citizens Alliance in 2002 and 2003 when Arnao was unable to provide sufficient explanation for those polling expenditures. (Tr. 6/25/07 p.m. at 125; Def. Ex. 11.) Kobasa discussed the issue of polling expenditures with Arnao on March 18, 2004. (Def. Ex. 11.) Kobasa then met with Arnao and Johnson to discuss the matter; in speaking to Johnson, it was Kobasa's impression

---

[5]The polls allegedly concerned the strength of candidates in races in which Fumo was interested and/or involved.

that Johnson had no prior knowledge of any expenditures for polling.  (*Id.*)  Kobasa did not bring

up the issue regarding the polling expenditures at either the December 2003 or January 2004

board meetings, nor was there any mention of the polling expenses in the consolidated audited

financial statements for the year ending December 31, 2002.  (*Id.*)

        Global Strategy Group ("Global Strategy"), a polling firm that had been paid by Citizens

Alliance, was served with a grand jury subpoena in September 2004.  (Gov't Ex. 21; Tr. 6/25/07

p.m. at 16-17.)  Global Strategy retained Jeh Johnson, of the law firm Paul, Weiss, Rifkind,

Wharton & Garrison, in New York, to represent it in connection with the subpoena; Jeh Johnson

has experience as a white collar criminal defense attorney and as a former Assistant United States

Attorney.  (Tr. 6/25/07 a.m. at 16-17, 29.)  Jeh Johnson contacted the Sprague firm to tell the

attorneys that Global Strategy had received the subpoena and to learn more about the nature of

the investigation, including what information the government was seeking.  (*Id.* at 18.)  On the

Monday or Tuesday before Thanksgiving in November 2004, Johnson contacted Jeh Johnson and

stated that he wanted to meet with him in person "to discuss something," but did not mention the

intended subject matter of the meeting during the telephone conversation.  (*Id.* at 18-19.)  At 8:30

a.m. on the day before Thanksgiving, Johnson traveled to New York to have an in-person

meeting with Jeh Johnson, which lasted approximately thirty minutes.  (*Id.* at 19-20.)  Johnson

told Jeh Johnson that Citizens Alliance had determined that the payments made to Global

Strategies were inappropriate or a mistake, and wanted Global Strategy to reimburse Citizens

Alliance, and then be paid by another entity.  (*Id.* at 20.)  Jeh Johnson responded that he would

talk to his client about the proposal, but would not take any action unless the U.S. Attorney were

informed, the transaction was completely transparent, and there was no effort to rewrite history.

(*Id.* at 20-21.)  Johnson agreed to the conditions and requested that the Sprague firm be the first to notify the government.  (*Id.* at 21, 28.)  On December 13, 2004, Johnson faxed to Jeh Johnson a draft letter that was to be sent to Jefrey Pollock of Global Strategy stating that payments were made to Global Strategy from Citizens Alliance "in error."  (Gov't Ex. 22.)  Jeh Johnson was concerned that the language of the letter suggested that the error was on the part of Global Strategy.  (Tr. 6/25/07 a.m. at 24.)  In a subsequent telephone conversation to Johnson, he questioned why Citizens Alliance did not simply have the appropriate Fumo political entity reimburse Citizens Alliance directly, rather than Global Strategy going out of pocket for the amounts.  (*Id.* at 25.)  Jeh Johnson never heard an answer that was satisfactory to him.  (*Id.* at 26.)  Shortly thereafter, someone from the Sprague firm informed Jeh Johnson "that they had found another way to do what they wanted to do."  (*Id.*)

The Global Strategy account name under which Citizens Alliance was billed was titled "PA Democratic State Senate-Citizens Alliance/PA Statewide." (Def. Ex. 1)  At least one payment for polls that were completed under that account was paid by the Democratic State Campaign Committee.  (*Id.*; Tr. 6/25/07 a.m. at 33-40.)  Jeh Johnson also recalled minor mistakes that were made with respect to the account.  (Tr. 6/25/07 a.m. at 34.)

On December 16, 2004, at the Citizens Alliance board meeting, the board authorized Arnao to recover monies paid by Citizens Alliance to Global Strategy.  (Gov't Ex. 19.)  Travelina recalled a discussion wherein it had been explained that as a non-profit, Citizens Alliance was not allowed to pay for polling and thus had to recoup the money expended.  (Tr. 6/25/07 p.m. at 35.)  He recalled Arnao leading the discussion, but that Johnson had participated as well.  (*Id.* at 36.)  At the time, he believed that the expenditure was only an oversight that Arnao did not really

understand and, if rectified, would not present a problem.  (*Id.* at 36-37.)

Meanwhile, counsel and advisors to Citizens Alliance endeavored to resolve the polling

issue with respect to Citizens Alliance's tax filings.  An email dated October 26, 2004, sent by

Lundy to Kobasa and another auditor from Stockton Bates, Art Amelio, concerning a meeting

with Johnson and Winning, stated:  "As we discussed, I think it important that all of the advisors

be on the same page as it regards the completion of 2003 financial statement and the 2003 IRS

Form 990 to be filed."  (Gov't Ex. 24; Tr. 6/25/07 at 110-11.)  In December 2004, Fumo, Arnao,

Johnson and Kobasa discussed their concerns arising out of the fact that Citizens Alliance's Form

990 return for 2003 was late and that the IRS would grant no further extensions to file the return,

which would result in a fine of $100 per day that the return was late. (Gov't Ex. 41; Tr. 6/25/07

p.m. at 118-19.)  A Stockton Bates record from January 19, 2005 reflects that additional meetings

involving Lundy, Johnson, and Winning took place, wherein those attorneys were to perform a

line-by-line review of the draft 900 Form, but Stockton Bates would not be represented.  (Gov't

Ex. 25.)  The day after these attorneys met, Lundy sent an email to Amelio that included an

attachment that they proposed be included with the 2003 Form 990.  (Gov't Ex. 26.)  The draft

stated that Citizens Alliance had "paid in error" invoices for political polling, but that Citizens

Alliance had requested and received reimbursement in full for all amounts paid in error.  (*Id.*)

After "going back and forth" about the matter, on September 12, 2005, Stockton Bates resigned

from the engagement with Citizens Alliance because the accountants determined that they had

not received satisfactory answers about how the polling-payment mistakes had occurred, and

because they were not given copies of the polling results, as requested.  (Tr. 6/25/07 p.m. at 123-

24.)  One of the auditors testified that, as a result of the deficiencies, they were uncomfortable

preparing the return in the way it was suggested.  (*Id.* at 118.)

The government intends to argue that, consistent with the indictment, Fumo and Arnao took steps to conceal their improper conduct by creating the defense that the political polling expenditures were a mere mistake.  (Gov't's Proposed Findings of Fact ¶ 39.)  Both the government and Fumo aver that Johnson will not be called as a witness with respect to the polling expenses.

### 4. Waiver by the Citizens Alliance Board

At a board meeting in June 2007, the Citizens Alliance board voted that if any conflicts of interest, with reference to the Sprague firm's representation, exist in this case, Citizens Alliance will waive those conflicts.  (Tr. 6/25/07 p.m. at 57-58.)  The board members discussed the potential conflicts outside of the presence of Citizens Alliance lawyers Winning and Lundy, and the new Executive Director, Christian DiCicco; however, two of the board members—Sfrisi and Travelina—testified that they did not fully read or comprehend the relevant pleadings or issues. (Tr. 6/25/07 a.m. at 126-30; Tr. 6/25/07 p.m. at 41.)  Sfrisi relied on the opinions of two board members who are lawyers, who did most of the talking during the board's discussion.  (Tr. 6/25/07 a.m. at 126-30.)  Those board members were not called as witnesses.

### E. Miscellaneous Evidence

In 2000, Citizens Alliance's outside auditor Ronald Beckman, who was engaged to represent Citizens Alliance in connection with an IRS audit, wrote a memorandum to Arnao that discussed certain improprieties uncovered during the audit related to Citizens Alliance.  (Def. Ex. 7.)  This memorandum was copied to Howard Braitman, CPA, an independent contractor affiliated with the Sprague firm; however, there was no evidence that any attorney from the

Sprague firm was made aware of any improper expenditure by Citizens Alliance as a result of the 2000 IRS audit. (Tr. 6/26/07 at 63; Def. Ex. 7.)

Agent Humphreys testified that she interviewed individuals from Verizon Corp. ("Verizon") in connection with the FBI's investigation of Fumo's dealings with Verizon. (Tr. 6/25/07 p.m. at 151.) She learned from Julia Conover, Verizon's general counsel, that Daniel Walen, the president of Verizon, had reached an agreement with Fumo that Verizon would provide a certain amount of legal work to a particular firm, the designation of which they would agree upon. Initially, they agreed on the amount of $500,000 per year for five years, but later they changed their agreement to $1,000,000 per year for three years. (*Id.* at 153.) Conover and Whelan had agreed that Verizon could not use Dilworth Paxon because Fumo was a member of that firm. (*Id.*) They also rejected the suggestion by Fumo of the Sprague firm because Verizon needed a full-service firm. (*Id.*) Steve Wojdak, a lobbyist for Verizon, testified before the grand jury that Fumo retained the Sprague firm to handle the filings and advocate the Verizon settlement. (Tr. 6/25/07 p.m. at 154.) In April 2002, the Pennsylvania Public Utility Commission approved a form of the settlement, which triggered Verizon's obligations; however, certain items remained unresolved, including Verizon's contribution to the Philly Pops and which firm would receive the legal work, with Fumo pressing for either Dilworth Paxon or the Sprague firm. (*Id.* at 154-55.) Eventually, Fumo and Verizon agreed the legal work should go to Thomas Leonard of Obermayer Rebmann Maxwell & Hippel LLP. (*Id.* at 155.) There was no evidence that anyone from the Sprague firm was aware that their firm had been suggested. (Tr. 6/26/07 at 36.)

In 2002, the Sprague firm represented several South Philadelphia community groups in

connection with the development of the new football and baseball stadiums.  (Tr. 6/25/07 p.m. at

56-57.)  On March 28, 2002, Carl Engelke, a member of Fumo's staff for approximately eight

and a half years, (Tr. 6/26/07 at 33), sent the following email to Arnao:

> This e-mail is the reminder you asked me to send you regarding the $20,000 -
> $25,000 that the Senator authorized through Citizen's to pay for the environment
> studies and associated attorneys fees for the Veteran's Stadium neighbors regarding
> the dirt the Phillies are piling up behind their homes.  Chuck Hardy and Tyler Wren
> from Sprague's office are the lead attorneys dealing with this issue.

(Gov't Ex. 32.)  Citizens Alliance paid the Sprague firm a $20,000 fee in connection with that

representation.  (*Id.*; Def. Ex. 5.)  Engelke testified that he meant that Fumo had authorized

Engelke to work with Citizens Alliance to provide the funding, but that Arnao was the sole

determiner of how Citizens Alliance spent its money.  (Tr. 6/26/07 at 29-30.)  The government

intends to call Engelke to testify about this matter in order to support its theory that Fumo

controlled Citizens Alliance.  (Gov't's Proposed Findings of Fact ¶ 60.)

On August 17, 2004, one of Fumo's associates sent Fumo an email requesting a

contribution from Citizens Alliance for a van for a disabled person in his district.  (Gov't Ex. 33.)

Fumo replied as follows:  "I will check with Ruth.  They won't give a dime without Sprague's

office signing off.  You understand the problem.  The Feds have already subpoenaed and gotten

62,000 pages of documents from them so they MUST be very careful.  How much does he

need?"  (*Id.*)  The government intends to argue that this evidence shows that Fumo controlled

Citizens Alliance and the fact that the Sprague firm was involved has evidentiary value.  (Gov't's

Proposed Findings of Fact ¶ 61.)

**F. Evidence Concerning the Potential Hardship Faced by Fumo**

Fumo has had a long-standing relationship with the Sprague firm.  (Tr. 6/26/07 at 117;

Gov't's Proposed Findings of Fact ¶ 3; Def.'s Proposed Findings of Fact ¶ 8.)  Attorneys from

the Sprague firm have represented Fumo in this matter since March 2004.  (Tr. 6/26/07 at 116;

Gov't's Proposed Findings of Fact ¶ 3; Def.'s Proposed Findings of Fact ¶ 3.)  Between five and

seven attorneys from the Sprague firm have worked a significant number of hours on Fumo's

defense.  (Tr. 6/26/07 at 116; Gov't's Proposed Findings of Fact ¶ 3; Def.'s Proposed Findings of

Fact ¶ 4.)  These attorneys are familiar with the hundreds of thousands of emails and documents

at issue in this case, and have interviewed most of the 300 witnesses the government has

interviewed, as well as others, in connection with the investigation.  (Tr. 6/26/07 at 13, 117;

Gov't's Proposed Findings of Fact ¶ 3; Def.'s Proposed Findings of Fact ¶¶ 5-6.)  Additionally,

attorneys from the Sprague firm have a long-standing and good working relationship with

counsel for codefendants in this case, with whom they have been cooperating since the beginning

of the investigation.  (Tr. 6/26/07 at 117; Gov't's Proposed Findings of Fact ¶ 3; Def.'s Proposed

Findings of Fact ¶ 7.)


## III. Legal Standard

"The Sixth Amendment to the Constitution guarantees that 'in all criminal prosecutions,

the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence.'"  *Wheat*

*v. United States*, 486 U.S. 153, 158 (1988) (quoting U.S. Const. amend. VI).  The Third Circuit

has made clear that "[t]he Sixth Amendment guarantee of effective assistance of counsel includes

two correlative rights, the right to adequate representation by an attorney of reasonable

competence and the right to the attorney's undivided loyalty free of conflict of interest."  *United*

*States v. Moscony*, 927 F.2d 742, 748 (3d Cir. 1991) (citations omitted).  "However, another right

is derived from the right to effective assistance of counsel, for the 'the right to counsel being

conceded, a defendant should be afforded a fair opportunity to secure counsel of his own

choice.'" *Moscony*, 927 F.2d at 748 (citing *Powell v. Alabama*, 287 U.S. 45, 53 (1932)). "Thus,

a presumptive right to the counsel of one's choice has been recognized as arising out of the Sixth

Amendment." *Moscony*, 927 F.2d at 748 (citing *Wheat*, 486 U.S. at 159). However, this

presumption is only that, and may be overcome "not only by a demonstration of actual conflict

but by a showing of a serious potential for conflict." *Wheat*, 486 U.S. at 164; *see also Moscony*,

927 F.2d at 750.

Determining whether such a conflict exists under this standard "must be left primarily to

the informed judgment of the trial court." *Wheat*, 486 U.S. at 164. As noted by the Third

Circuit, this "is no simple task. 'The likelihood and dimensions of nascent conflicts of interest

are notoriously hard to predict, even for those thoroughly familiar with criminal trials.'" *United

States v. Voigt*, 89 F.3d 1050, 1076 (3d Cir. 1996) (quoting *Wheat*, 486 U.S. at 162-63). Thus,

when reviewing a district court's decision whether or not to disqualify on conflict-of-interest

grounds, the Third Circuit performs a two-step inquiry to determine whether the disqualification

was proper. First, the court of appeals "exercise[s] plenary review to determine whether the

district court's disqualification was arbitrary—'the product of a failure to balance proper

considerations of judicial administration against the right to counsel.'" *United States v. Stewart*,

185 F.3d 112, 120 (3d Cir. 1999) (quoting *Voigt*, 89 F.3d at 1074). Where the trial court "makes

a reasoned determination on the basis of a fully prepared record, its decision will not be deemed

arbitrary." *Voigt*, 89 F.3d at 1075 (internal quotation omitted). "Formal findings of fact are not

required." *Id.* at 1076. If the district court's determination is held not arbitrary, the court of

appeals then considers whether the district court abused its discretion in disqualifying the attorney. *Stewart*, 185 F.3d at 120. Where there has been an erroneous deprivation of counsel, a defendant need not additionally show prejudice and this error is not subject to review for harmlessness. *United States v. Gonzalez-Lopez*, 126 S. Ct. 2557, 2563-64 (2006) ("We have little trouble concluding that erroneous deprivation of the right to counsel of choice, with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as structural error." (internal quotations omitted)).

Where a defendant chooses to waive any conflict of interest faced by his or her attorney in order to retain counsel of choice, a court may accept that waiver under appropriate circumstances. *See Gov't of Virgin Islands v. Zepp*, 748 F.2d 125, 139 (3d Cir. 1984) ("The court should also determine whether there has been a waiver of the conflict, whether the waiver was effective or whether a waiver was possible."). Nevertheless, "[f]ederal courts have an independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them," thus the district court may override a defendant's waiver of his attorney's conflict of interest. *Wheat*, 486 U.S. at 160; *see also Stewart*, 185 F.3d at 122 (citing *Wheat*, 486 U.S. at 164, and stating "a district court has discretion to disqualify counsel if a potential conflict exists even where the represented parties have waived the conflict"). The Supreme Court's holding in *Gonzalez-Lopez* that an erroneous deprivation constitutes a structural error, 126 S. Ct. at 2564, does not impair the district court's "substantial latitude in refusing waivers of conflicts of interest not only in those rare cases where an actual conflict may be demonstrated before trial, but in the more common cases where a potential for conflict exists which may or may not burgeon into an actual conflict

28

as the trial progresses." *Wheat*, 486 U.S. at 163; *see also Gonzalez-Lopez*, 126 S. Ct. at 2565 (stating that "[n]othing we have said today casts any doubt or places any qualification upon our previous holdings that limit the right to counsel of choice").

Quoting from a Third Circuit case, *United States v. Dolan*, 570 F.2d 1177, 1184 (3d Cir. 1978), the Supreme Court explained that "[w]hen a trial court finds an actual conflict of interest which impairs the ability of a criminal defendant's chosen counsel to conform with the ABA Code of Professional Responsibility, the court should not be required to tolerate an inadequate representation of a defendant." *Wheat*, 486 U.S. at 162. As such, the Pennsylvania Rules of Professional Conduct, 204 Pa. Code § 81.4 ("RPC"), provide a guide for considering whether ethical standards have been maintained in a given situation. *See In Re Grand Jury Investigation*, 2006 U.S. Dist. LEXIS 57756, at *11 (E.D. Pa. May 16, 2006) (finding that the RPC provide a useful template against which to measure the conduct of lawyers subject to a disqualification motion); *United States v. Stout*, 723 F. Supp. 297, 303 (E.D. Pa. 1989) (using the RPC to determine ethical considerations governing disqualification motion). The Local Rules of Civil and Criminal Procedure for the Eastern District of Pennsylvania require attorneys practicing in the district to comply with the RPC. *See* Local R. Civ. P. 83.6; Local R. Crim. P. 1.2. However, "[t]he disqualification of a defendant's chosen counsel need not be . . . predicated on a finding of a specific RPC violation." *Voigt*, 89 F.3d at 1076 n.12.

## IV. Discussion

The government contends that counsel for Fumo should be disqualified because attorneys from the Sprague firm have represented the alleged victim entities, are witnesses to pertinent

events, and will be placed in the position of arguing the propriety of their own actions.[6]  I will

address each of these arguments turn.[7]

### A. The Sprague Firm's Representation of the Victim Entities

The government contends that the Sprague firm should be disqualified because attorneys

from the Sprague firm have represented all of the victim entities in this case.  The government

asserts that it is conclusively presumed that in the course of that representation the attorneys

learned confidential information and, therefore, cannot ethically cross-examine representatives

from those entities.  Moreover, they have conflicting loyalties to their former and current clients.

The Third Circuit has found an attorney's representation intolerable, and therefore

warranting disqualification, where he or she has conflicting duties of loyalty to his or her current

and former clients.  *See Stewart*, 185 F.3d at 121 (stating that although "the typical scenario

where disqualification becomes necessary entails an attorney's attempt to represent multiple

defendants in the same prosecution," conflicts arise where a defendant's counsel of choice has

"divided loyalties due to concurrent or prior representation of another client who is a co-

defendant, a co-conspirator, or a government witness" (internal quotation and emphasis

omitted)).  Such a situation may occur where the attorney has previously obtained confidential

---

[6]The government asserts that disqualification is warranted because the Sprague firm is the subject of potential disciplinary action related to documents attached to the filing of a petition for writ of certiorari with the Supreme Court in a matter related to this investigation during the grand jury phase.  (Gov't Mot. For Hearing 48-52.)  However, I have determined that this matter has no bearing on the present motion since it does not relate to any of the allegations in the superseding indictment, will not be the subject of any testimony or other evidence at trial, and does not affect the conduct of defense counsel during trial in any manner.

[7]I have set forth all of the factual allegations in some detail in Part II of this memorandum.  A number are relatively inconsequential and clearly waivable in the colloquy.  They are not addressed here.

information or is placed in the position of cross-examining his or her former client at the trial of his or her current client.

In *Moscony*, the Third Circuit affirmed the district court's disqualification of the defendant's chosen attorney based on that attorney's prior representation of government witnesses in the same investigation. 927 F.2d at 748. Throughout the grand jury investigation, the attorney had represented the defendant as well as three of his employees. *Id.* at 747. After the defendant was indicted, recognizing that the employees would be called as witnesses, the government, joined by those employees, moved to disqualify the defendant's counsel. *Id.* All three employees testified that they believed that the attorney in question was their personal attorney and had had confidential communications with him. *Id.* The district court disqualified the law firm of the defendant's attorney, finding that the employees' testimony would be central to the government's case. *Id.* at 747-48. The court held that the necessary vigorous cross-examination if forgone would have deprived the defendant of his Sixth Amendment right to counsel, and if pursued would have violated the ethical standard regarding privileged communications. *Id.* at 748. The Third Circuit agreed, affirming disqualification and stating that "an actual conflict of interest obviously existed. . . . Conflicts of interest arise whenever an attorney's loyalties are divided and an attorney who cross-examines former clients inherently encounters divided loyalties." *Id.* at 750 (internal citations omitted). The court specifically found that the attorney could have used the confidential information that he had obtained from the employees "to cross-examine, and possibly impeach, them at [the defendant's] trial." *Id.* Further, while the defendant tried to minimize the importance of the confidential information imparted to his attorney, the Third Circuit found that its substance was at "the very crux of the

31

government's case." *Id.*

A similar situation existed in *Voigt*, where the attorney in question represented multiple codefendants in the same investigation, and at least one of those codefendants would testify at the defendant's trial. 89 F.3d at 1078. Thus, "[s]ince there was a strong possibility that [the witness] might face cross-examination by a former attorney, there was a serious potential for a conflict of interest." *Id.* The Court of Appeals also noted that at least one codefendant who had interacted with that attorney refused to waive the attorney-client privilege and stated that she had imparted confidential information to the attorney, which "may have been sufficient, in and of itself, to warrant disqualification." *Id.* at 1079.

The disqualification of a defendant's chosen attorney was also upheld where the attorney represented government witnesses not in the same criminal action, but with respect to the same subject matter. *See Stewart*, 185 F.3d 112. In *Stewart*, the defendant's chosen attorneys simultaneously represented, in a parallel civil RICO action, four government witnesses who were to testify at the defendant's criminal trial. *Id.* at 119. The district court disqualified the law firm, determining that "the firm's defending of [the defendant] was 'directly adverse' to its representation of the four individuals, and thus placed the . . . attorneys in the 'unenviable position of cross-examining their own clients with the help of attorney-client communications.'" *Id.* at 120 (quoting *United States v. Stewart*, 1997 U.S. Dist. LEXIS 14909, at **9-10 (E.D. Pa. Sept. 24, 1997)). The Third Circuit upheld the disqualification, over a waiver by all parties involved, finding that because the law firm's attorneys "would have been part of a team of attorneys required to cross-examine the four individuals testifying for the government, [the defendant's] right to effective counsel could have been compromised by the divided loyalties of

32

his own attorney." *Stewart*, 185 F.3d at 121.  The Third Circuit went on to reject the defendant's

contention that his publicly declared defense strategy—which was not to focus blame on those

four individuals but to assert that the allegedly fraudulent transactions were legal—did not

diverge from the interests of the four witnesses, thus presenting no conflict.  *Id.*  In doing so, the

court noted that "a defendant's trial strategy is not fixed. . . . Accordingly, the district court could

not accept [the defendant's] assurances that he would not pursue an alternate strategy at trial."

*Id.* at 122.

The receipt of confidential information was equally critical in the decision to disqualify in

*United States v. Provenzano*, 620 F.2d 985 (3d Cir. 1980).  In that case, the attorney's prior

representation of a government witness in another matter—the witness's murder

conviction—resulted in the attorney learning confidential information relating to not only the

murder, but also to events of that period, which would be useful to impeach him as a witness

against the defendant.  *Id.* at 1004.  In affirming the disqualification, the Third Circuit noted:

> In the present case, although the district judge did not make explicit findings that [the
> attorney] knew specific facts that would have involved him in conflict, the district
> court correctly concluded that he must assume as much, since he could not actually
> inquire about the matter without thereby himself destroying the confidence. . . . [The
> attorney's] access to privileged information is conclusively presumed.

*Id.* at 1005.  In making its determination, the court noted specifically that "[b]ecause [the

witness's] dealings at the time of his murder conviction bore so heavily on the case, it was clear

that he could not be cross-examined without going into that sensitive period."  *Id.*

RPC 1.7 and 1.9 also inform the subject of prior representation and generally comport

with the above-stated case law.  Rule 1.7 states as follows:

(a) Except as provided in paragraph (b), a lawyer shall not represent a client if the

representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:

(1) the representation of one client will be directly adverse to another client; or

(2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.

(b) Notwithstanding the existence of a concurrent conflict of interest under paragraph (a), a lawyer may represent a client if:

(1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;

(2) the representation is not prohibited by law;

(3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and

(4) each affected client gives informed consent.

§ 81.4 (Rule 1.7). Rule 1.9 states:

(a) A lawyer who has formerly represented a client in a matter shall not thereafter represent another person in the same or a substantially related matter in which that person's interests are materially adverse to the interests of the former client unless the former client gives informed consent.

(b) A lawyer shall not knowingly represent a person in the same or a substantially related matter in which a firm with which the lawyer formerly was associated had previously represented a client

(1) whose interests are materially adverse to that person; and

(2) about whom the lawyer had acquired information protected by Rules 1.6 and 1.9(c) that is material to the matter;

unless the former client gives informed consent.

(c) A lawyer who has formerly represented a client in a matter or whose present or former firm has formerly represented a client in a matter shall not thereafter:

34

(1) use information relating to the representation to the disadvantage of the former client except as these Rules would permit or require with respect to a client, or when the information has become generally known; or

(2) reveal information relating to the representation except as these Rules would permit or require with respect to a client.

§ 81.4 (Rule 1.9).  An explanatory comment to Rule 1.9 explains:  "The underlying question is whether the lawyer was so involved in the matter that the subsequent representation can be justly regarded as a changing of sides in the matter in question."  *Id.* (Rule 1.9, cmt. 3).  The comments further elucidate that "[m]atters are 'substantially related' for purposes of [RPC 1.9] if they involve the same transaction or legal dispute or if there otherwise is a substantial risk that confidential factual information as would normally have been obtained in the prior representation would materially advance the client's position in the subsequent matter."  *Id.*  Also, the comments specifically note with respect to the representation of an organizational client that "general knowledge of the client's policies and practices ordinarily will not preclude a subsequent representation; on the other hand, knowledge of specific facts gained in a prior representation that are relevant to the matter in question ordinarily will preclude such a representation."  *Id.*

Here, the government alleges that attorneys from the Sprague firm face a conflict of interest because they represented, at various times, the three victim entities in this case. According to the government, the attorneys would be placed in the position of cross-examining former clients after presumably having learned confidential information during the course of the prior representation, which could be used in furtherance of such cross-examination.  In addition, the attorneys would encounter divided loyalties in that they owe a duty to their former clients as

well as to their current client, Fumo.  I disagree that the Sprague firm's previous representation of the Senate groups, the ISM or Citizens Alliance necessarily warrants disqualification.

With respect to the Senate, the Sprague firm represented particular Senate groups—the SDAC and the SDCS—not the Senate as a body, which is alleged to be the victim in this case as the result of the misuse of Senate employees.  These groups are not separate legal entities. Moreover, there was no evidence that attorneys from the Sprague firm learned confidential information in the course of that representation of the SDAC and the SDCS that could, in the course of vigorously defending Fumo, either prejudice the Senate or its employees, or impinge upon the duty of loyalty owed to these former clients.   Neither Faber, the Chief Clerk of the Senate, nor any of the individual employees of the SDCS or the SDAC were individually represented by the Sprague firm.  Thus, the fact that these individuals will be called to testify does not place attorneys from the Sprague firm in the untenable position of cross-examining former clients armed with confidential information gleaned through prior representation. Therefore, the instant situation does not present an unwaivable conflict of interest.[8]

Similarly, the Sprague firm's prior representation of the ISM does not present a conflict requiring disqualification.  Its representation of the ISM was of short duration (approximately two months) and concerned media inquiries about expenditures by the ISM's president for his personal benefit and his authorization of the use of the ISM's assets for Fumo's benefit[9]—matters unrelated to the crux of the instant investigation.  The representation ended when it became clear

---

[8]I also note that the Senate's ability to pursue restitution independently from Fumo is not affected by the Sprague firm's prior representation of any Senate group.

[9]Carter is alleged to have allowed Fumo to use a yacht or yachts owned by the ISM separately from the chartering of a yacht for Fumo's benefit previously described.

that the government was also investigating the conduct of Fumo.  While *Provenzano* dictates that

the receipt of confidential information is conclusively presumed, that presumption does not

appear warranted with respect to information that does not relate to the representation.  In

*Provenzano*, the court noted that the attorney's prior representation of the government's witness

bore directly on the case at hand, which was critical to its determination that the district judge

properly disqualified the attorney.  *Provenzano*, 620 F.2d at 1004 (finding that there "would be . .

. a conflict of interest situation between the duty of vigorous representation of [the defendant]

and the duty of loyalty to [the former client], *since* confidences relating to [the former client's]

murder conviction and events of that period would be useful to impeach him as a witness against

[the defendant]" (emphasis added)); *see also* § 81.4 (Rule 1.9, cmt. 3) ("A conclusion about the

possession of such information may be based on the nature of the services the lawyer provided

the former client and information that would in ordinary practice be learned by a lawyer

providing such services.").

The Sprague firm's previous representation of Citizens Alliance is more problematic

because it was not as unrelated as the representation of the Senate groups was to the Senate, or as

limited in time and subject matter as the representation of the ISM, and because it was more

closely related to events alleged in the indictment.  However, while the nature of Johnson's

representation of Citizens Alliance was broad, he neither represented the board members

individually nor represented Citizens Alliance or the board members with respect to this

investigation.  There was no suggestion of any specific area of knowledge that Johnson might

have learned of confidences from Citizens Alliance that, in keeping with the duty of loyalty to

Citizens Alliance, would be impermissible for the Sprague firm to use in the cross-examination

of Citizen Alliance witnesses, thus affecting the ability to defend Fumo vigorously.  As such, the

potential for members of the Sprague firm to use confidential client communications to the

advantage of their current client in contravention of ethical rules or to have the duty of loyalty to

Citizens Alliance negatively affect their ability to defend Fumo vigorously is much less than in

the situations discussed in the leading Third Circuit cases.

Even more important, Citizens Alliance has a board of directors and a new Executive

Director that may independently decide whether to pursue restitution from Arnao or Fumo and

whether to waive any conflict of interest and the attorney-client privilege.  The Citizens Alliance

board members have thus far been amenable to a waiver of any conflict of interest and the

attorney-client privilege, and to provide informed consent pursuant to RPC 1.7 and 1.9.  (*See* Tr.

7/10/07 at 68-69.)  Of course, if the conflicts and privilege are to be waived, the court must be

satisfied, through a colloquy, that the waivers by the members of the Citizens Alliance board and

its new Executive Director, both with respect to the conflict of interest and the attorney-client

privilege, are knowing, intelligent and voluntary.  For a waiver to be knowing and intelligent, the

court must be satisfied that those waiving the privilege are aware of the foreseeable prejudices of

the continued representation and of the possibly detrimental consequences of those prejudices.

*See Dolan*, 570 F.2d at 1181.  Where individuals do "not fully comprehend the ramifications

flowing from [the conflict]," their waivers are not "truly voluntary."  *See Stewart*, 185 F.3d at

122 (internal citations and alterations omitted).  The court may also doubt the voluntariness of a

waiver where there is reason to suspect it was motivated by a personal or financial relationship

with the defendant, or by a desire to lessen the damage one's adverse testimony may cause the

defendant.  *Id.*  According to the RPC, "'[i]nformed consent' denotes the consent by a person to a

proposed course of conduct after the lawyer has communicated adequate information and explanation about the material risks of and reasonably available alternatives to the proposed course of conduct." § 81.4 (Rule 1.0(e)). Accordingly, counsel and I will conduct a colloquy with members of the Citizens Alliance board and the new Executive Director to confirm that their waivers meet these standards. Additionally, given Arnao's role in Citizens Alliance during this time and as a defendant here, she similarly has an interest in this issue and I will conduct a colloquy with her as well.

Another issue stemming from the Sprague firm's representation of these three entities is that the government intends to argue that the placement of attorneys from the Sprague firm as counsel to these entities, especially Citizens Alliance, has evidentiary value, which argument it is entitled to assert. As such, the Sprague firm will be mentioned repeatedly at Fumo's trial. However, because the conduct with which the attorneys' names will be associated simply does not rise to the level of egregious conduct at issue in the relevant cases—where attorneys represented multiple codefendants or learned pertinent confidential information from government witnesses whom they represented—Fumo may waive the conflict of interest faced by his attorneys based on their previous representation of the ISM, the Senate entities and the Citizens Alliance.

## B. The Sprague Firm Attorneys as Witnesses to and Involved in Pertinent Events

The government next contends that the Sprague firm should be disqualified because its attorneys are witnesses to events relevant to the charges in the indictment. As such, they are potential witnesses at trial, and the roles of witness and advocate are inherently inconsistent, even if the attorney is not called at trial. Further, the government asserts that the Sprague attorneys

39

will be placed in the position of having to defend their own conduct—regardless of whether that conduct ultimately proves to be improper—and, thus, face an additional conflict of interest. Additionally, because the Sprague attorneys will be repeatedly mentioned during the trial in relation to certain events, they will be giving implicit testimony, or acting as unsworn witnesses, when addressing events in which they personally participated.

The Third Circuit has previously addressed these types of conflicts, most notably in *United States v. Merlino*, 349 F.3d 144 (3d Cir. 2003), and *Government of Virgin Islands v. Zepp*, 748 F.2d 125 (3d Cir. 1984), cases that the government argues are analogous to the present situation. In *Merlino*, one of the defendant's attorneys visited a potential government witness in jail in order to determine whether the witness had decided to cooperate with the government and possibly to deter him from that course. 349 F.3d at 151. The lawyer brought to the witness a letter from the defendant, which reassured the witness that it was safe for him to return to Philadelphia upon his release. *Id.* The lawyer also reinforced that message and brought greetings from the acting boss of the mob organization that was the subject of the underlying indictment. *Id.* The attorney then offered from the defendant $100 for the witness's commissary account, which he refused to accept. *Id.* The lawyer subsequently sent the witness a check for $150, which the witness did not cash. *Id.*

The Third Circuit explained that the attorney's conduct in *Merlino* raised the potential for a conflict of interest for two reasons—the same two reasons posited by the government in the instant action. The first reason related to the attorney being placed in the position of having to defend the propriety of his own actions:

First, there was a potential for conflict between [the attorney's] personal interest in

40

avoiding an accusation of professional or criminal misconduct and his duty to vigorously defend [his client].  An attorney who faces criminal or disciplinary charges for his or her actions in a case will not be able to pursue the client's interests free from concern for his or her own.  As even [the defendant] was forced to concede, the District Court's finding that [his attorney's] conduct suggested an attempt to influence [the government witness] was "a suggestion of potential criminal liability."

*Id.* at 151.

The second reason related to the fact that the attorney could have been called as a witness, "as it is often impermissible for an attorney to be both an advocate and a witness." *Id.* at 152 (citing § 81.4 (RPC 3.7 (a)).  The Third Circuit elaborated on the nature of the conflict as follows:

The government introduced evidence at trial of [the attorney's] visit to show [the defendant's] consciousness of guilt.  Had [the defendant] wished to challenge that evidence, he could have done so only by calling [the attorney] as a witness, and if [the attorney] had remained as his attorney, an actual conflict of interest would have existed.  We note, as well, that disqualification may also be appropriate where it is based solely on a lawyer's personal knowledge of events likely to be presented at trial, even if the lawyer is unlikely to be called as a witness.  The fact that [the attorney] informed [the witness] that [the client's] uncle, Joseph Ligambi, had become the boss, that the [the mafia] did not intend to kill [the government witness], and that it was safe for [the witness] to return to Philadelphia, put [the attorney] in a compromised position given that [the defendant] employed a "mob denial"defense at trial.

*Id.* at 152 (internal citation omitted).

In *Zepp*, the Third Circuit reversed the judgment of conviction and granted the defendant a new trial where the district court had erred by failing to advise the defendant of any conflict of interest or obtain a knowing waiver based on the same two sources of conflict.[10]  748 F.2d at 127,

_____

[10]The court additionally opined that it might have been questionable whether a court could have permitted the defendant knowingly to waive her right to the effective assistance of counsel in light of the factual circumstances of this case.  *See Zepp*, 748 F.2d at 139.

136.  The defendant was arrested following a raid on the home she shared with her codefendant. *Id.* at 127.  After police arrested her codefendant, the defendant's attorney arrived, entered the residence with the defendant, and then shut the door.  *Id.* at 128.  Moments later, narcotics officers still outside the house heard a toilet flush several times.  *Id.*  After searching the septic tank connected to the house, agents found forty triangular-shaped plastic bags, twenty of which tested positive for cocaine.  *Id.*  The parties agreed to a stipulation wherein the attorney stated that at no time when he was in the house were any of the bathrooms used by him, which stipulation was entered into evidence at both the suppression hearing and at the defendant's trial. *Id.* at 129.  The attorney continued to represent the defendant.  *Id.*

The court determined that the attorney's interests diverged in at least two respects from the defendant's:  "First, trial counsel could have been indicted for the same charges on which he represented [the defendant], and second, trial counsel was a witness for the prosecution."  *Id.* at 136.  With respect to the attorney's potential criminal liability, the court explained that direct evidence of wrongdoing was unnecessary to conclude that the attorney had an actual conflict of interest, as he "had equal access and opportunity while alone in the house with [the defendant] to flush cocaine down the toilet."  *Id.*  Thus, it was "clear" that he faced potential liability related to the destruction of evidence.  *Id.*  Given this scenario, the court concluded that:

> it is unrealistic for this court to assume that [the defendant's] attorney vigorously pursued his client's best interest entirely free from the influence of his concern to avoid his own incrimination.  In circumstances such as these, when defense counsel has independent personal information regarding the facts underlying his client's charges, and faces potential liability for those charges, he has an actual conflict of interest.

*Id.*  Consequently, from these facts alone, the court agreed with the defendant that her attorney

should have withdrawn from the case or been disqualified by the court.

The court also determined that the defendant's counsel's testimony, as admitted via the stipulation, deprived her of the effective assistance of counsel as "[t]he roles of an advocate and of a witness are inherently inconsistent." *Id.* at 138. The court found that:

> [t]rial counsel's interest in testifying on his own behalf impaired the exercise of independent professional judgment on behalf of his client. From our view, the admission of such testimony is so egregious that it constitutes a total abandonment of the loyalty which counsel owes his client. Thus, we also agree with [the defendant's] contention that trial counsel was required to withdraw regardless of whether his testimony would be exculpatory or inculpatory.

*Id.* at 138-39.

The RPC also address scenarios in which a lawyer could potentially serve as a witness against his or her own client. Rule 3.7 states that:

> (a) A lawyer shall not act as advocate at a trial in which the lawyer is likely to be a necessary witness unless:
>
> (1) the testimony relates to an uncontested issue;
>
> (2) the testimony relates to the nature and value of legal services rendered in the case; or
>
> (3) disqualification of the lawyer would work substantial hardship on the client.
>
> (b) A lawyer may act as advocate in a trial in which another lawyer in the lawyer's firm is likely to be called as a witness unless precluded from doing so by Rule 1.7 or Rule 1.9.

§ 81.4 (Rule 3.7). The comments explain that "[a] witness is required to testify on the basis of personal knowledge, while an advocate is expected to explain and comment on evidence given by others. It may not be clear whether a statement by an advocate-witness should be taken as proof or as an analysis of the proof." *Id.* (Rule 3.7, cmt. 2).

43

After careful consideration of the issues raised by the government and the evidence presented at the evidentiary hearing, as described in Part II, *supra*, I have determined that the majority of the conflicts presented by the government are relatively minor in nature, are basically uncontested, and can be cured through a waiver colloquy with Fumo.  However, there are four issues that are of significant concern given the mandates of the relevant cases and the RPC, which I will discuss in greater detail below.  After a thorough review of these matters, and consideration of the potential hardship faced by Fumo, *see supra* Part II.F & *infra* Part V, I have concluded that none of the allegations at issue requires disqualification since all of the conflicts may be cured through an adequate waiver by Fumo.

### 1. The Sprague Firm's Representation of Senate Entities During the Obstruction of Justice

The government asserts that because attorneys from the Sprague firm represented the SDAC and the SDCS when documents and electronic evidence were allegedly destroyed in an effort to obstruct justice, they are witnesses to the improper conduct and are placed in the position of defending the propriety of their own conduct.  The government concedes, however, that there has been no evidence presented that any attorney from the Sprague firm had personal knowledge of, was blind to, or participated in the alleged improper destruction of documents and electronic evidence.  Nonetheless, the government is certainly entitled to argue that the fact that the Sprague firm represented the SDAC and the SDCS during this time period has evidentiary value and is part of a pattern of Fumo's use of his favored attorneys.  Thus, during trial the Sprague firm and its attorneys will be referenced when this evidence is presented, and such references have the potential to affect the jury's perception of Fumo's trial counsel.  However,

given that the association of the Sprague firm with the particular events in question does not rise to even near the level of seriousness of either the *Merlino* or *Zepp* cases, I find that Fumo may waive this conflict of interest through a colloquy.

### 2. The Sprague Firm's Involvement in the Ratification of Past Expenditures

The next set of events concerns Johnson's presence at the Citizens Alliance board meetings and his involvement in the board's ratification of Citizens Alliance's past expenditures. The minutes for two board meetings state, in almost identical language, that "Mr. Johnson reviewed all financial documents including all previous year's tax returns, loans, and operating expenses. He concluded that all monies have been allocated for and used for their rightful purposes in accordance with bylaws and mission statement." (Gov't Ex. 19.) While the parties certainly dispute who exactly made this statement at the board meetings and which particular documents Johnson reviewed, it is undeniable that the board minutes do so state and that Johnson was present at the board meetings as Citizens Alliance's attorney. On the other hand, the significance of Johnson's presence at the board meetings is mitigated by the fact that Citizens Alliance board members stated that they relied primarily or exclusively on Arnao in deciding whether to approve the previous expenditures and sign the consents.

Upon consideration of his role at the board meetings, Johnson faces a conflict of interest in that he is placed in the position of arguing the appropriateness of his own conduct with respect to Citizens Alliance's ratification of the past expenditures given the government's allegations of the improper expenditures made during those years. While this conflict certainly exists and is recognized as problematic by Third Circuit case law, the instant facts are not equivalent to those of the *Merlino* case where, "as even [the defendant] was forced to concede, the District Court's

finding that [his attorney's] conduct suggested an attempt to influence [the government witness] was 'a suggestion of potential criminal liability.'"  *Merlino*, 349 F.3d at 151.  Similarly, the instant case is distinguishable from *Zepp*, where it was "clear" that the attorney faced potential liability for the destruction of evidence, as he and the defendant were the only two people inside the house when the criminal activity occurred.  *Zepp*, 748 F.2d at 136.  Johnson's involvement in this case is much more peripheral and of considerably less evidentiary significance.

Johnson is, however, a potential witness to explain the statements contained in the board minutes and to rebut the government's allegations that he was present at the board meetings and procured the ratifications in order to further Fumo's interests. Johnson could be called as a witness to explain his part in the ratification process.  Johnson would thus potentially violate the prohibition on an attorney acting as an advocate and a witness simultaneously.  However, as mentioned above, the significance of Johnson's involvement is lessened by the board members' expressed reliance on Arnao in deciding to sign the consents.  Moreover, all parties involved have stated unequivocally that they do not intend to call Johnson as a witness, which I will confirm through a colloquy with Fumo and Arnao.[11]  While the Third Circuit has cautioned courts from accepting a waiver of a particular trial strategy, *see Stewart*, 185 F.3d at 122, the defendants' averments that they do not intend to present an "advice of counsel" defense or to call Johnson as a witness would implicate the principles of judicial estoppel.  *See Yong Wong Park v. Att'y Gen. of the U.S.*, 472 F.3d 66, 73 (3d Cir. 2006) (stating that judicial estoppel "seeks to

---

[11]RPC 3.7(b) permits trial counsel (Sprague and Sheppard) to act as an advocate even though another attorney in their firm (Johnson) is likely to be called as a witness, unless precluded from doing so by Rule 1.7 or 1.9.

prevent a litigant from asserting a position inconsistent with one that she has previously asserted in the same or in a previous proceeding . . . [and] is intended to prevent litigants from playing fast and loose with the courts" (internal quotation and alterations omitted)).[12]

Given the circumstances presented—the board members have testified that, despite the statements in the minutes, they did not rely on Johnson in deciding to ratify the past expenditures; Fumo and the government have averred that they will not call Johnson as a witness; the lack of contested facts; the hardship on Fumo, *see supra* Part II.F and *infra* Part V; and the anticipated waivers by Fumo and Arnao—there is no violation of RPC 3.7.

### 3. The Sprague Firm's Involvement in Transactions Related to Polling Expenditures

The last set of facts that deserves specific discussion concerns Johnson's involvement in the "unwinding" of the polling expenses on behalf of Citizens Alliance. Johnson's discussion with Jeh Johnson and subsequent attempts to characterize the billings to Citizens Alliance as a mistake are undisputed. All of the facts and documents necessary to establish the transactions are available from other witnesses, and both the government and Fumo have averred that they do not intend to call Johnson in order to further or rebut any inferences or to explain the transactions. Moreover, there has been no evidence that the actions in and of themselves were improper. However, similar to the above discussion regarding the ratification of past expenditures, the inferences that the government intends to argue the jury should draw from this set of events will call into question the appropriateness of Johnson's conduct. As such, Johnson will be placed in the position of defending the propriety of his own conduct. But, similar to the

---

[12]Such a change in strategy would certainly require a further review of the disqualification issue based on the new facts.

previously discussed events concerning the ratifications, the potential inferences or improprieties related to Johnson's actions are not remotely equivalent to the those in the *Merlino* case where the attorney had essentially attempted to bribe a potential government witness on behalf of his client and had acknowledged the existence of the Mafia enterprise. *See Merlino*, 349 F.3d at 151. Nor are they the same or as serious as those in the *Zepp* case where the attorney was present when evidence was destroyed. *See Zepp*, 748 F.2d at 136. The facts the government established that it will adduce at trial related to this incident are not nearly as problematic as in those cases in this Circuit where disqualification was affirmed or mandated, thus I find that Fumo may waive this conflict of interest, if he so desires. Given that Johnson is not a necessary witness, the government has stated it will not call him, and the relevant facts are undisputed, combined with the substantial hardship to Fumo if he were denied his counsel of choice, the dictates of RPC 3.7 are satisfied.

### 4. Attorneys From the Sprague Firm as Unsworn Witnesses

Finally, the government argues that Johnson is an unsworn witness with respect to the ratifications and the polling, and that he will be engaging in improper vouching akin to the prosecutor in *United States v. Vitillo*, 2007 U.S. App. LEXIS 15098 (3d Cir. June 25, 2007). In that case, an important issue at trial was whether the defendant had confessed to a law enforcement agent during an interview, thus charging the jury with determining the respective parties' credibility. *Id.* at *24. The defendant argued, and the Third Circuit agreed, that the prosecutors, who were present at the interview, impermissibly vouched for the agent's testimony even though they did not testify. *Id.* at **29, 35. Specifically, the prosecutors repeatedly emphasized that they were present during the interview when the confession allegedly took place

48

and thereby implied that the agent was telling the truth because they would not have introduced the testimony otherwise. *Id.* at **29-30. The Third Circuit explained that vouching occurs where the prosecutor assures the jury that the testimony of a government witness is credible and this assurance is based on either the prosecutor's personal knowledge, or other information not contained in the record. *Id.* at *30. Such vouching is "not permitted because it can jeopardize the defendant's right to be tried solely on the basis of the evidence presented to the jury as the prosecutor's imprimatur may induce the jury to trust the Government's judgment rather than its own view of the evidence." *Id.* at **30-31 (internal quotation omitted).

If either party believed that any member of the Sprague firm, Johnson especially, has personal knowledge or other information not contained in the record that will be presented or impliedly presented at trial, through argument or the questioning of witnesses, either party could have determined to call Johnson as a witness. However, the pertinent facts related to the Sprague firm's representation of Citizens Alliance, the ratification of the past expenditures, and the unwinding of the polling expenditures are largely undisputed, and both sides have made clear that they do not intend to call Johnson or any other member of the Sprague firm as a witness. What is at issue are the inferences to be drawn from those facts. The government's mere speculation that Johnson or any other attorney has or will use personal knowledge when presenting Fumo's defense akin to the prosecutor in *Vitillo* is not enough to rebut the presumption that the defendant should be able to retain the counsel of his choice. Any potential for conflict concerning this issue can be cured through a waiver by Fumo in conjunction with the routine specific admonishment to the jury that the evidence at trial consists of documents and the witnesses' answers to examination, not the questions themselves or the arguments of counsel. If

the government believes that any attorney involved is improperly vouching for a witness or

impermissibly acting as an unsworn witness, counsel can object at that time.[13]


**V. Conclusion**

      In essence, the relevant cases and their animating principles dictate that an attorney faces

a conflict when he or she cross-examines a former client, represents a client while simultaneously

having to defend his or her own behavior, or has been a witness to pertinent events.  All of these

situations are present in this case to some degree.  Attorneys from the Sprague firm represented,

in some capacity, two of the entities alleged to be the victims in this case.  Likewise, the

attorneys were present and involved in events that are relevant to the charges in the indictment

and could be called as witnesses.  However, unlike the controlling cases in the Third Circuit in

which disqualification was necessary, I believe that these conflicts can be cured by a waiver and

do not overcome the constitutionally mandated presumption that a defendant is entitled to

counsel of choice.  As discussed above, the circumstances presented by this case simply do not

rise to the level of egregiousness of those cases in which disqualification was compelled or

approved.

      I also note specifically that, while hardly dispositive, the equities weigh in favor of Fumo

retaining the counsel of his choice.  I have no doubt that Fumo will be able to retain equally able

counsel to aid in his defense, but given his long-standing relationship with the Sprague firm, and

---

      [13]I also note that *Vitillo* was premised on the defendant's right to a fair trial, *see* 2007 U.S. App. LEXIS 15098, at **30-31, so it is unclear to what extent a defendant's right would be prejudiced by his own attorneys' vouching in furtherance of his defense.

the length of time, expense, and effort attorneys from that firm have devoted to this investigation—notably the reviewing of documents and interviewing of witnesses—consideration of hardship factors militates in favor of Fumo's choice of counsel.

Although I have concluded that Fumo may waive the conflicts of interests faced by his attorneys, I must satisfy myself that Fumo understands the intricacies and gravity of the conflicts, and will knowingly, intelligently and voluntarily waive those conflicts in order to continue to be represented by the Sprague firm. It is my understanding that Fumo has retained separate counsel in order to advise him regarding the waiver of his right to conflict-free trial counsel. In *Dolan*, 570 F.2d at 1181, the Third Circuit adopted, from the Fifth Circuit's decision in *United States v. Garcia*, 517 F.2d 272 (5th Cir.1975), "the form of the inquiry [the district court] should follow in substance, though not necessarily in precise form," when determining whether a waiver is appropriate, directing as follows:

> [T]he district court should address each defendant personally and forthrightly advise him of the potential dangers of representation by counsel with a conflict of interest. The defendant must be at liberty to question the district court as to the nature and consequences of his legal representation. Most significantly, the court should seek to elicit a narrative response from each defendant that he has been advised of his right to effective representation, that he understands the details of his attorney's possible conflict of interest and the potential perils of such a conflict, that he has discussed the matter with his attorney or if he wishes with outside counsel, and that he voluntarily waives his Sixth Amendment protections. It is, of course, vital that the waiver be established by "clear, unequivocal, and unambiguous language."

*Dolan*, 570 F.2d at 1181 (quoting *Garcia*, 517 F.2d at 278). Thus, the remaining question is whether the court can, with the assistance of counsel, conduct an adequate waiver colloquy, given the multitude of issues present in this case. *See Wheat*, 486 U.S. at 163 ("These imponderables are difficult enough for a lawyer to assess, and even more difficult to convey by

51

way of explanation to a criminal defendant untutored in the niceties of legal ethics.").  The parties

are directed to submit proposed questions to the court for the waiver colloquy.

An appropriate order follows.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | CRIMINAL ACTION |
| v. | : | |
| | : | NO. 06-319 |
| VINCENT J. FUMO | : | |
| | : | |

## Order

AND NOW on this _____ day of August 2007, upon careful consideration of the government's motion for hearing regarding possible conflicts of interest (Docket No. 84), Senator Vincent J. Fumo's response thereto, the government's reply, the parties supplemental briefs and proposed findings of fact, and after hearings held on June 25, 26 and July 10, 2007, it is hereby ORDERED that:

(1) The government's motion for a hearing is GRANTED, the hearing having been held on June 25, 26 and July 9, 2007;

(2) The government's motion to disqualify the law firm of Sprague & Sprague is DENIED, subject to an adequate waiver of conflicts of interest by Senator Vincent J. Fumo, Ruth Arnao, and the Executive Director and the individual board members of Citizens Alliance;

(3) The parties shall submit proposed questions for a colloquy with Senator Vincent J. Fumo within fourteen (14) days of the date of this order;

(4) The parties shall submit proposed questions for an additional colloquy with Ruth Arnao within fourteen (14) days of the date of this order;

(5) The parties shall submit proposed questions for a colloquy with the board members of

Citizens Alliance and the current Executive Director of Citizens Alliance within fourteen (14) days of the date of this order;

(6) The parties shall confer as to the appropriate procedures to secure the attendance of the current Executive Director and the board members of Citizens Alliance for a waiver colloquy and advise the court of their joint or individual suggestions by letter within seven (7) days of date of this order; and

(7) A hearing during which the court will conduct colloquies with Senator Vincent J. Fumo, Ruth Arnao, the board members of Citizens Alliance, and the current Executive Director of Citizens Alliance, is scheduled for September 28, 2007, at 9:30 a.m., in Courtroom 14B.

_____s/ William H. Yohn Jr._____
William H. Yohn Jr., Judge
