IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| v. | : | CRIMINAL NO. 06-319 |
| LEONARD LUCHKO | : | |

GOVERNMENT'S SENTENCING MEMORANDUM

## I.    INTRODUCTION

On February 6, 2007, the government filed a superseding indictment charging defendant Leonard Luchko with 29 criminal counts relating to an effort by Luchko and others to thwart a federal investigation concerning defendants Vincent J. Fumo, Ruth Arnao, and others. Specifically, Luchko was charged with the following criminal offenses:

Count 109:

18 U.S.C. § 371 (conspiracy to obstruct justice)

Counts 110, 111, 113, 119, 122, 123, 128, 132:

18 U.S.C. § 1512(b)(2)(B) (obstruction of justice - 8 counts)

Count 126:

18 U.S.C. § 1512(c)(1) (obstruction of justice)

Counts 112, 115, 120, 121, 124, 125, 127, 129, 130, 131, and 133-141:

18 U.S.C. § 1519 (obstruction of justice - 19 counts)

On August 11, 2008, pursuant to a written plea agreement, defendant Luchko entered a plea of guilty to the charges.  For the reasons explained below, the government recommends a sentence that is within the advisory guideline range of 30 to 37 months.

## II.    OFFENSE CONDUCT

The government agrees with the facts set forth in the Presentence Investigation Report ("PSR").  The facts can be briefly summarized as follows:

Special agents of the FBI and the IRS, beginning in early 2003, conducted a criminal investigation into the activities of defendant Vincent J. Fumo, a Pennsylvania state senator; the nonprofit organization, Citizens Alliance for Better Neighborhoods ("Citizens Alliance"), which Fumo controlled; and other companies and individuals associated with Fumo and Citizens Alliance, including defendant Ruth Arnao, the executive director of Citizens Alliance.

A related grand jury investigation regarding these matters began in approximately February 2003, first regarding Citizens Alliance, and then expanded to address the other subjects outlined above.  The investigation focused on whether, among other things, Fumo, in violation of federal law, committed extortion in connection with his dealings with PECO and Verizon; whether he used the personnel and resources of the Pennsylvania Senate for his personal and political benefit; whether he did the same with personnel and resources of Citizens Alliance; whether he defrauded the Independence Seaport Museum through the use of its resources for his personal benefit, in violation of

federal law; whether he and his associates violated the Internal Revenue laws; and whether Fumo conspired with anyone else in federal criminal offenses.

Leonard Luchko was employed by Senate Democratic Computer Services, an entity of the Senate of Pennsylvania, during the period at issue in the indictment.  He was assigned to the district office of Senator Fumo, located at 1208 Tasker Street in Philadelphia, where his job was to provide computer support to Fumo and to Fumo's district office staff.  Beginning in approximately November 2003, Luchko engaged with others, including co-defendants Fumo, Arnao, and Mark Eister (another Senate computer aide), in a conspiracy to obstruct the government's investigation.  Luchko did so for no personal benefit of his own besides the maintenance of his employment.  He acted at Fumo's direction, to protect Fumo and his associates.[1]

The superseding indictment, in Count 109, explains Luchko's conduct at great length, and the facts explained there are incorporated in this memorandum.  In summary, the conspirators endeavored to destroy e-mail and other electronic evidence in order to prevent the FBI, the IRS, and the federal grand jury from receiving or reviewing

---

[1]    Co-defendant Eister pled guilty in this Court to the charge of conspiracy to obstruct justice (Count 109), and to four substantive charges of obstruction.  He is scheduled to be sentenced on May 21, 2009.

On March 16, 2009, following a jury trial before the Honorable Ronald Buckwalter, co-defendants Fumo and Arnao were found guilty of the conspiracy charge, and of substantive obstruction offenses (32 for Fumo, and seven for Arnao), in addition to numerous other criminal offenses.  The sentencing for Fumo is scheduled for July 14, 2009, and for Arnao on July 21, 2009.

such evidence in the course of the investigation.  Luchko, along with his co-defendants and others, worked exhaustively to destroy electronic evidence.  In part, Luchko and his co-conspirators (a) systematically destroyed e-mail communications sent to or received by Fumo and Arnao; (b) created and implemented a formal schedule to run specialized computer programs known as Secure Clean Deep Clean and PGP Free Space Wipe that erased any trace of deleted electronic files on computer hard drives, servers, PC cards, and other electronic storage devices; (c) instructed Fumo's employees that under no circumstances, without Fumo's permission, were they permitted to save any e-mail sent to or received from Fumo; (d) logged into the e-mail accounts of Fumo's employees to scan their e-mail to determine that they were, in fact, not saving any e-mail relating to Fumo; and (e) deleted and wiped other electronic equipment, such as the Blackberry communication devices used by Fumo and Arnao, among other persons.

　　　　　In short, the purpose of the conspiracy was to assure that electronic evidence relevant to the investigation and potentially harmful to Fumo and his associates was permanently deleted and therefore unavailable to the grand jury and the federal investigators.  The conspirators succeeded in deleting and destroying substantial amounts of electronic evidence relevant to the investigation.  In part, the conspirators permanently erased virtually all e-mails predating 2005 which had been stored on all computers used by Citizens Alliance and Arnao, its executive director; virtually all e-mail predating 2005 in which Fumo was a sender or recipient, which had been held on Fumo's server in Harrisburg, and on the computer equipment used by his staff in Harrisburg and Philadelphia; and

virtually all e-mail referencing Citizens Alliance which was held on computer equipment used by Fumo.  The conspiracy also succeeded in destroying virtually all e-mail evidence regarding the PECO and Verizon matters, thwarting the investigators' ability to determine whether federal crimes were committed in connection with those matters.

Fumo was the leader of this conspiracy, who directed Luchko to take all necessary steps to destroy virtually all e-mail records of Citizens Alliance, and all e-mail correspondence of the Senate staff to or from Fumo.  Luchko responded with alacrity and determination to carry out Fumo's commands.  As early as December 1, 2003, when Fumo first became concerned about a nascent investigation, Luchko directed 24 members of Fumo's staff to delete correspondence.  The effort went into high gear beginning on January 25, 2004, when the Philadelphia Inquirer publicized the existence of an FBI investigation.  Beginning on that day, Luchko sought to enforce the e-mail deletion policy, and to systematically wipe the computers and Blackberry communication devices of dozens of Senate employees of any evidence of previous correspondence with Fumo.[2]

As the months progressed, Luchko's efforts increased.  On June 7, 2004, as Fumo's panic regarding the investigation intensified, Luchko complained to others about the steps he was taking in destroying records and backup systems, but stated, "That's just the

---

[2]    These events were uncovered and proven, in part, because Luchko and others retained correspondence which was not with Fumo.  While an enormous quantity of pertinent evidence was undoubtedly lost, Luchko's communications with others did reveal what he was doing on behalf of Fumo.  This carelessness illustrates the fact that Luchko was acting solely to protect Fumo, without any concern for his own conduct.

way it has to be for now they (FBI) won't be around forever.  Then we can go back to our normal routine."  He added, "He has us doing stuff that I know is going to come back and bite us in the ass. . . . I don't blame Fumo the FBI is really coming at him hard and he is innocent I truly believe that or I wouldn't do this I have delt with the FBI before at the Navy Yard and when they can't find anything wrong they try to manufacutre stuff so they can justify the man hours and money spent on a fruitless investigation."

By early 2005, Luchko's devotion to the cause was unrelenting, even as he learned that the FBI was concerned about the dearth of e-mail produced in response to a previous subpoena to Citizens Alliance, and even after he discussed the matter directly with government representatives.  On January 21, 2005, after learning of a new subpoena to Citizens Alliance, he talked and wrote to Ruth Arnao, its executive director, about additional ideas for deleting records before the FBI obtained the computer equipment.  On February 3, 2005, he wrote to co-conspirator Mark Eister, "They are looking for emails to and from Ruth Arnao and they are pissed because I wiped her PC and destroyed her old [PC] card."  Two days later, as he made arrangements for the FBI to copy the Citizens Alliance equipment, he confided in Eister, "I think they are going to be completely surprised when they check out Ruth's PC when they get a load of the Card setup and the Keystroke monitor detector's and Secure Clean Software along with PGP.  They aren't getting shit off that PC . . . ."

On February 10, 2005, after the FBI imaged the Citizens Alliance computers, Luchko wrote a full report to Fumo.  Continuing the campaign to obstruct the investigation,

he concluded, "I am off to the shore tomorrow to update your computers and wipe them as well I am also going to wipe the computers at Monmouth Ave." (where both Fumo and Arnao maintained computers).  Luchko remained focused to the end.  On February 18, 2005, when FBI agents entered the Tasker Street office to execute a search warrant, they found that a wiping program was running on Luchko's computer, systematically erasing any traces of deleted files.  An investigator yanked the computer's plug out of the wall to shut it down.

The specific substantive charges to which Luchko pled guilty were as follows:

**Count 110**: On December 1, 2003, defendant Luchko sent 24 members of Fumo's staff and Senate contractors, including Ruth Arnao, an e-mail communication that instructed each person to delete all e-mail communications to and from Fumo.

**Count 111**: On January 25, 2004, Luchko sent approximately 29 members of Fumo's staff and Senate contractors, including Ruth Arnao, an e-mail that instructed each person to, among other things, "set up a time with [fellow computer aide Don Wilson] or myself so we can wipe" the Blackberry communications devices used by these persons and also to "set up a time with Don or myself so we can run security updates" on the Senate-issued laptops used by these persons.

**Count 112**: On April 6, 2004, Luchko destroyed data held on computer equipment issued to Maryann Quartullo, Jamie Spagna, and Fumo by running a wiping program on each of these computers.  Quartullo and Spagna were Senate aides in the Tasker

office who extensively performed personal tasks for Fumo for which they were paid by the Senate, such as handling his personal and campaign bank accounts and a variety of business ventures.

**Count 113**: On May 10, 2004, Luchko sent to Senate contractor Philip Press an e-mail communication that instructed Press that he must delete all e-mail communications to and from Fumo.  Press, while paid by the Senate, largely participated in political campaigns at Fumo's direction.

**Count 115**: On June 11, 2004, Luchko ran a wiping program on his district office computer.

**Count 119**: On June 14, 2004, Luchko sent to Press an e-mail communication that again instructed Press that he must delete all e-mail communications to and from Fumo.

**Count 120**: On August 6, 2004, Luchko again wiped his own district office computer.

**Count 121**: On August 6, 2004, Luchko ran a wiping program on Ruth Arnao's office computer at Citizens Alliance.

**Count 122**: On August 26, 2004, Luchko sent to Charles Hoffman, the manager of Fumo's district office, an e-mail communication that notified Hoffman that Patricia Freeland, who had been given a Senate contract by Fumo, was not deleting all of her e-mail communications to and from Fumo.  Luchko requested that Hoffman

communicate with Freeland to ensure that she deleted all of her e-mail communications to and from Fumo.

**Count 123**: On October 28, 2004, Luchko sent to approximately 24 members of Fumo's staff and Senate contractors, including Ruth Arnao at Citizens Alliance, an e-mail communication that instructed each person that "under no circumstances" were they, without the approval of Fumo, permitted "to save any email in your IN box or Sent Items that is sent to or received from Fumo," and also instructing each person to "[m]ake sure you clean out your 'Deleted Items' as well."

**Count 124**: On December 9, 2004, Luchko again wiped Arnao's office computer at Citizens Alliance.

**Count 125**: On December 30, 2004, Luchko again wiped Quartullo's computer (at the same time that Quartullo participated in an extensive effort to secure repayment for Citizens Alliance of $215,161.11, which Citizens Alliance had illegally paid in earlier years to conduct political polls for Fumo's benefit, and which had become a subject of the investigation).

**Counts 126-127**: On January 21, 2005, Luchko aided and abetted the destruction of computer files and other electronic evidence held on computer equipment issued to or used by Arnao, by sending her an e-mail with instructions regarding additional efforts to delete her electronic files and run wiping programs.

**Count 128**: On January 26, 2005, Luchko sent to approximately 19 members of Fumo's staff, including Ruth Arnao at Citizens Alliance, an e-mail communication

that instructed, among other things, that each person must "get rid of any mail you Received or Sent to Fumo," and must manually empty their deleted e-mail items folder in order to "clean[] up any traces of email that may still be residing in the space you just created by deleting your email."

**Count 129**: On January 28, 2005, Luchko destroyed (or caused to be destroyed) an e-mail file that was stored on computer equipment issued to Arnao as the executive director of Citizens Alliance.

**Count 130**: On January 31, 2005, Luchko again ran a wiping program on his own district office computer.

**Count 131**: On February 4, 2005, Luchko ran a wiping program on Fumo's office computer.

**Count 132**: On February 11, 2005, Luchko sent to Donald Wilson an e-mail communication that, among things, instructed him that "[a]fter you sync her BB [i.e., Arnao's Blackberry] this morning tell her I think you should wipe it as well before the FBI ask for it."

**Count 133**: On February 11, 2005, Luchko wiped computers used by Fumo at Fumo's shore home in New Jersey.

**Count 134**: On February 11, 2005, Luchko wiped the computer used by Arnao at her New Jersey shore home.

**Count 135**: On February 12, 2005, Luchko wiped a laptop computer used by Fumo at Fumo's residence in Philadelphia.

**Count 136**: On February 16, 2005, Luchko again wiped a laptop computer at Fumo's residence in Philadelphia.

**Count 137**: On February 19, 2005, Luchko destroyed data held on a PC card issued to and used by Luchko by running a wiping program on it.

**Count 138**: On March 18, 2005, Luchko wiped a Blackberry communications device issued to and used by Fumo staff member Edward Hanlon.

**Count 139**: On June 17, 2005, Luchko destroyed data held on a PC card issued to and used by Fumo by running a wiping program on it.

**Count 140**: On September 2, 2005, Luchko ran a wiping program on his Senate-issued laptop computer.

**Count 141**: On October 20, 2005, Luchko concealed inside his home records, documents, and tangible objects, that is, 6 PC cards containing electronic files of Senate staff members, Luchko's Blackberry device, and Luchko's Senate-issued laptop computer.  These items, which had previously been subpoenaed by the government but not produced by Fumo's Senate office, were found in a court-authorized search of Luchko's home on that day.

III.    **CALCULATION OF SENTENCE**

A.    **Maximum Penalties**

The Court may impose the following statutory maximum sentence:

**Count 109** (18 U.S.C. § 371 (conspiracy to obstruct justice)): 5 years' imprisonment, a fine of $250,000, 3 years' supervised release, and a special assessment of $100.

**Counts 110, 111, 113, 119, 122, 123, 128, 132** (18 U.S.C. § 1512(b)(2)(B) (obstruction of justice)): 10 years' imprisonment, a fine of $250,000, 3 years' supervised release, and a special assessment of $100 (per count).

**Count 126** (18 U.S.C. § 1512(c)(1) (obstruction of justice)): 20 years' imprisonment, a fine of $250,000, 3 years' supervised release, and a special assessment of $100 (per count).

**Counts 112, 115, 120, 121, 124, 125, 127, 129, 130, 131, and 133-141** (18 U.S.C. § 1519 (obstruction of justice)): 20 years' imprisonment, a fine of $250,000, 3 years' supervised release, and a special assessment of $100 (per count).

**TOTAL MAXIMUM SENTENCE**: 485 years' imprisonment, a fine of $7.25 million, a special assessment of $2,900, and three years' supervised release.

### B.    Sentencing Guidelines

The government agrees with the probation officer's calculation of the total offense level of 19 and criminal history category of I, which provides for an advisory guideline range of imprisonment of 30 to 37 months.  PSR, at ¶¶144-161, 185.

### 1.    Cross-Reference to Other Guidelines

The calculation is based on Section 2J1.2 of the guidelines, which imposes a base offense level of 14; increased by 2 under Section 2J1.2(b)(2) because the offense

involved substantial interference with the administration of justice; and by 3 under Section 2J1.2(b)(3) because the offense involved the destruction of a substantial number of items and was otherwise extensive.

While this calculation under Section 2J1.2 is correct, the government observes that the mandatory cross-reference which appears at Section 2J1.2(c) provides:

> If the offense involved obstructing the investigation or prosecution of a criminal offense, apply § 2X3.1 (Accessory After the Fact) in respect to that criminal offense, if the resulting offense level is greater than that determined above.

The background note adds: "Use of this cross reference will provide an enhanced offense level when the obstruction is in respect to a particularly serious offense, whether such offense was committed by the defendant or another person."

Under this provision, it ordinarily would be necessary to calculate and apply to the defendant the far higher guideline level applicable to Fumo based on the scores of convictions of Fumo for mail and wire fraud, as the object of the scheme to obstruct justice in which defendant Luchko participated was to thwart the prosecution of Fumo for those offenses. However, the circumstances of Luchko's case are unusual. While he did have knowledge of Fumo's illegal use of Senate personnel and resources to serve Fumo's personal and political desires (indeed, Luchko was one of the many Senate staffers who devotedly carried out personal and political tasks at Fumo's direction in the Senate office in Philadelphia), there is no evidence that he had any conception of the gross extent of those fraudulent acts, nor any knowledge of Fumo's efforts to defraud Citizens Alliance and the Independence Seaport Museum. Thus, the scope of Fumo's considerable crimes was far

beyond Luchko's knowledge, and the government does not advocate any guideline increase pursuant to the cross-reference. Stated differently, if there were any increase, we would advocate in the interest of justice that Luchko receive a downward departure to the unadjusted range for obstruction of justice which the Probation Office calculated.

2.      **Acceptance of Responsibility**

The PSR properly declines to award defendant Luchko a reduction for acceptance of responsibility under U.S.S.G. § 3E1.1.  Section 3E1.1 provides for a two- or three-level decrease "[i]f the defendant clearly demonstrates acceptance of responsibility for his offense."  Application note 1 to U.S.S.G. § 3E1.1 provides that the district court should consider, among other things, "(a) truthfully admitting the conduct comprising the offense(s) of conviction, and truthfully admitting or not falsely denying any addition relevant conduct for which the defendant is accountable" in determining whether a defendant qualifies for acceptance of responsibility.

A defendant seeking an acceptance of responsibility reduction bears the burden of establishing by a preponderance of the evidence that he is entitled to the reduction.  See United States v. Muhammad, 146 F.3d 161, 167 (3d Cir. 1998).  The sentencing court "has the obligation to assess the totality of the situation in determining whether the defendant accepted responsibility."  United States v. Cohen, 171 F.3d 796, 806 (3d Cir. 1999) (quoting United States v. McDowell, 888 F.2d 285, 293 n.2 (3d Cir. 1989)).

The Third Circuit has held that a guilty plea alone does not raise any presumption of acceptance of responsibility.  See United States v. Singh, 923 F.2d 1039,

1043 (3d Cir. 1991); United States v. Ortiz, 878 F.2d 125, 128 (3d Cir. 1989) (defendant who pled guilty but minimized role not entitled to acceptance of responsibility). While "[e]ntry of a plea of guilty prior to the commencement of trial combined with truthfully admitting the conduct comprising the offense of conviction . . . will constitute significant evidence of acceptance of responsibility," the entry of a guilty plea does not entitle a defendant to a U.S.S.G. § 3E1.1 reduction as "a matter of right." See U.S.S.G. § 3E1.1 app. note 3. Evidence of a plea "may be outweighed by conduct of the defendant that is inconsistent with such acceptance of responsibility." Id.

Courts have recognized that a defendant who denies relevant conduct which is plainly established by evidence need not be awarded with credit under Section 3E1.1. See United States v. Frierson, 945 F.2d 650, 656 (3d Cir. 1991) ("the sentencing court may consider whether the defendant has admitted or denied conduct beyond the specific conduct of the offense of conviction in the course of determining whether to grant a two-level reduction for acceptance of responsibility"); United States v. Wyatt, 19 F.3d 1283, 1285 (8th Cir. 1994) (defendant was not entitled to reduction for acceptance of responsibility where he denied at sentencing that he had engaged in prior crack transactions assessed against him as relevant conduct); United States v. Anderson, 15 F.3d 979, 980-81 (10th Cir. 1994) (inmate was properly denied credit where he pled guilty to interfering with officer, but denied relevant conduct of possession of prohibited weapon during commission of offense).

Here, defendant Luchko engaged in a variety of conduct that is entirely inconsistent with acceptance of responsibility.  Prior to pleading guilty, and in the months after his guilty plea, he denied in e-mail communications to current and former Fumo staffers that he had done anything wrong, instead blaming his decision to plead guilty on the fact that he had run out of funds to pay an attorney.  During the trial, despite having received explicit admonitions from his counsel and from the government not to attempt to communicate with defendants Fumo, Arnao, and Eister, or any trial witness, Luchko repeatedly did so, and in ways that demonstrated his contempt for the government and its prosecution, as well as his steadfast denial of responsibility for his own actions.

Additionally, throughout the trial, Luchko posted online messages under a pseudonym condemning the government's case.  On a daily basis, the major Philadelphia newspapers posted their coverage of the trial on their web site, www.philly.com, and invited readers to post comments below the articles; those comments were open to the public.  On a regular basis, Luchko, using different "screen names" which did not reveal his identity, posted messages supporting Fumo and disparaging the prosecution.

Throughout this period, Luchko met with government representatives, professing to be a cooperating witness.  These meetings were extensive, and he did provide helpful explanations regarding some of the government's evidence, and also produced materials which the government did not previously possess.  However, on January 8, 2009, after the very last meeting with government counsel prior to Luchko's planned appearance on the stand concluded, Luchko's attorney returned to advise the prosecutors and agents of

the astonishing news he had just learned -- that Luchko had continued throughout the trial to correspond with and support the other defendants.

Over the next two days, Luchko produced an avalanche of this correspondence. Much of it predated Luchko's August 11, 2008, guilty plea, and a good deal postdated it. An illustrative portion of the voluminous records is discussed here.

On July 28, 2008, two weeks before he entered his guilty plea before this Court, Luchko sent an e-mail to Jamie Spagna, a former Fumo staffer and a government trial witness, in which he stated that, among other things, "So I am NOT going to trial I basically can't afford to be innocent and that is sad! . . . I hate to admit to crimes I didn't commit but I have to stay out of jail!" Three days later, Luchko again sent an e-mail to Spagna, this time stating, "Last Thursday you couldn't have gotten me to plead guilty with a gun. They mess with my money and look where I am at now!" That same day, he wrote to Arnao, stating that "the main reason this happened [i.e. his guilty plea] was lawyer notifying me that my defense fund was shut down and I owed him $100,000 and the cost of a trial was $20,000 a week that really left me only one choice I couldn't bankrupt me and my mom behind this." Then, on August 8, 2008, just three days before he pled guilty, Luchko wrote to Spagna and said, "I am only in this mess because I was doing my job for VJF it is very fucked up!"

On September 17, 2008, in a disturbing expression of his lack of remorse for his actions and inability to accept personal responsibility for them, Luchko shared the

following with Spagna: "I read in the paper this morning that the trial is delayed a month due to the judge's illness (I hope that prick dies) . . ."

On October 16, 2008, Luchko wrote to Maryann Quartullo, a former Fumo staffer and government trial witness, stating that "every night I go over the events that led up to my pleading guilty second guessing my decision and I always come up with the same answer I had no choice.  The thing I just can't figure out is why they stopped paying my legal bills you know and I know that nothing is done at Tasker Street without it being meticulously thought through so that means they made a conscious decision to stop paying my bills and I will never understand why because I was ready for a trial I was in for the duration even if it meant jail."

On October 19, 2008, the night before jury selection in the trial of Fumo and Arnao resumed, his heart remained with them, and he wrote to both wishing them luck.  On October 31, 2008, Luchko explicitly acknowledged once again that he was sorry that he pled guilty, thereby demonstrating his inability to accept any responsibility for his offenses: "I regret pleading guilty I should have told them all to go 'FUCK OFF' my lawyer, VJF the Feds everyone I should have fought it somehow now I am so alone."

On December 10, 2008, Luchko reported to Spagna that the prosecutors in this case forced him to plead guilty to crimes he did not actually commit, and attempted to suborn perjury through his anticipated trial testimony:

> My main concern is the fact that they had me plead guilty to shit that they know I didn't do and they now may want me to testify that I did do that stuff in court and that

is something I am not prepared to do. Its one thing for me to take a hit but it is quite another to implicate someone else in something that isn't true.

In an e-mail that further reinforces the fact that he did not plead guilty because he believed he was guilty, and did so based only upon his perception that he could not afford to defend the charges he was facing (in express conflict with the sworn testimony he provided during his guilty plea colloquy in which he acknowledged that if he could not afford a lawyer one would be appointed to represent him free of charge), on December 22, 2008, Luchko wrote to Spagna, this time stating that "His [i.e. Fumo's] lawyers fucked up when they said it would be better for me to be with the prosecution. They should have paid my legal bills they would have avoided this."

On January 3, 2009, almost five months after he pled guilty, and just before he was scheduled to testify in the Fumo trial, Luchko sent an e-mail to trial witness and former Fumo staffer Gina Novelli, in which he again confirmed in the clearest of terms that he truly does not believe he did anything wrong, and does not accept responsibility for his actions:

> They say they want me to tell the truth, but the truth is I don't think I did anything wrong and they don't want to hear that for example they asked my why did I plead guilty and I told them there are a lot of reasons why I pled guilty there was the money the possible jail time the fact that going to trial with VJF hurt me but they want me to say I pled guilty because I am guilty!

In addition to repeatedly sharing with his former colleagues the fact that he had not committed any crimes or done anything wrong, had been forced to plead guilty only because he ran out of funds, and was being pressured by prosecutors to testify to

- 19 -

falsehoods, Luchko repeatedly e-mailed Fumo, Arnao, and former Fumo staffers with

disparaging comments on the government's evidence, its witnesses, and even the

prosecutors.  He also made numerous blog postings of a similar nature.

For example, early in the trial, after Fumo's son-in-law and former aide

Christian Marrone provided significant testimony, Luchko let loose a barrage of

disparaging comments to Fumo, Arnao, Fumo aides, and the public at large.  In one

message, to Quartullo, he stated:

> He [Marrone] did this for the Republicans for the job in the Pentagon according to
> my lawyer he planned the whole thing if you could read his Grand Jury testimony it
> would turn your stomach I can't go into detail because of the gag order he comes off
> as this crusading whistle blower who only wanted to do good for the people!  As for
> her [Fumo's daughter and Marrone's wife, Nicole] she is just evil unless your father
> is physically abusing you why would you ever want him in jail and its really unusual
> for Italians where family is everything.

He wrote to Arnao:

> Didn't you just want to grab him by the throat that lying sack of shit if it was soooo
> terrible at Tasker Street why didn't he just leave?  He took every perk!  Are you guys
> in court today?

In some of the philly.com postings, he wrote:

- This guy Cain hit the lottery he was looking at 30 years now he is only looking at 2!
  [November 12, 2008, referring to cooperating witness Howard Cain.]

- I cannot believe the FEDS have already spent 5 years and over 20 million dollars on
  this investigation.  I can think of a hundred different other things that the FBI could
  have been working on and my tax dollars could have been spent on!  [November 17,
  2008.]

- Let me get this straight Coyne and Marrone (Republicans) get immunity and they
  both admitted to embezzling money from Citizens Alliance but the two computer
  techs Luchko and Eister (Democrats) who are just a couple of working guys, that

according to the Government didn't profit by this in ANY way got indicted.  That STINKS!  [November 20, 2008.]

- After a five year, investigation and 25 million dollars this is all Assistant U.S. Attorney John J. Pease could come up with?  By his logic if Pease's secretary makes him coffee in the morning he is committing a federal crime because she is being paid by tax dollars.  Patrick Meehan wanted Fumo at ANY cost and this is a classic example of throwing everything agains the wall and seeing what sticks. . . . [December 2, 2008.]

On January 7, 2009, the night before Luchko expected to testify (and the night before the government and Luchko's counsel finally began to learn of these and hundreds of other messages), Luchko wrote to both Fumo and Arnao:

I am truly sorry for what's going to happen tomorrow, there will be no sleep for me tonight, and until I hear otherwise from you I will always consider you my dear friends!

Luchko's conduct, in the end, did not affect the outcome of the government's case.  The government succeeded despite his behavior in obtaining guilty verdicts at trial against Fumo and Arnao on every count of the superseding indictment.  Nevertheless, Luchko's actions caused significant difficulties.  First, it was quite detrimental that, in the middle of an intensely hard-fought and complex trial, the entire government trial team was compelled to spend a full three-day weekend, sixteen hours or more each day, beginning on Friday, January 9, 2009, digesting, producing to the defense, and addressing the consequences of Luchko's voluminous correspondence.  Second, upon a defense request, the Court was compelled to allow significant delays in the trial; the Court recessed the trial on the entire afternoon of January 12, and the mornings of January 13 and 14, to permit the

defense time to review all of the new materials, thus disrupting the government's trial presentation.

When the trial progressed, the government had no choice but to refrain from calling Luchko as a witness, given that his totally inconsistent statements to the government, to this Court, and to others during the course of the trial itself proved that he is not a credible person who is worthy of belief. This deprived the government of the ability to offer Luchko's explanation of the relevant e-mails. Instead, the government was left with the course of admitting many of Luchko's e-mails from 2004 and 2005 as co-conspirator statements, read on the stand by a government investigator.

Not only was that less than satisfactory, but it presented the defense with undeserved opportunities. First, pursuant to Rule 806 of the Federal Rules of Evidence, the defense was allowed to endeavor to impeach the credibility of Luchko, the out-of-court declarant, with other statements. The defense thus cherry-picked from the bounty of newly produced e-mails in which Luchko made derogatory statements about the government's investigation and theories, and placed a few before the jury. Then, these statements and Luchko's absence allowed the defense to make the argument to the jury that Luchko had acted alone in obstructing justice, as a rogue agent dedicated to protecting Fumo without Fumo's knowledge.[3]

_____

[3]    The consequences would likely have been even worse had the government not learned of Luchko's e-mail correspondence and blog postings when it did. Without a doubt, Fumo and Arnao's counsel were aware of the messages which Luchko had sent to their clients, and were lying in wait to present them on cross-examination and destroy any

In short, Luchko's conduct reflected neither acceptance of responsibility nor assistance to the government; it just made the prosecutors and agents' work much harder and imperiled the government's case regarding the obstruction charges. The Probation Office is absolutely correct in finding that Luchko's extraordinary statements represent the opposite of acceptance of responsibility.

## IV.    ANALYSIS AND SENTENCE RECOMMENDATION.

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 128 S. Ct. 586, 596 (2007). Thus, the Sentencing Guidelines remain an indispensable resource for assuring appropriate and uniform punishment for federal criminal offenses.

Once the Court has properly calculated the guideline range, the Court must next consider all of the sentencing considerations set forth in Section 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment

---

credibility that Luchko had. In this matter, government counsel have nothing but the highest respect for Luchko's experienced advocate, James Schwartzman, who upon learning of Luchko's actions on January 8, 2009, immediately recognized the peril to his client and to the administration of justice and acted instantly to advise the government and ameliorate the consequences.

for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense.  18 U.S.C. § 3553(a).[4]

A full review of all pertinent factors supports the conclusion that a sentence that is within the advisory guideline range is appropriate in this case.  Luchko's misconduct was serious.  During an important federal investigation of criminal conduct by a sitting Pennsylvania state senator, Luchko endeavored, on a daily basis for more than a year, to take every step possible to destroy computer evidence of Fumo's affairs.  He did so with unwavering focus and determination, and took pride in the thoroughness of his efforts.

The report authored by Nicholas S. Patapsis, Psy. D., a psychologist who examined Luchko at the request of Luchko's counsel, offers an unobjectionable explanation

---

[4]    Further, the "parsimony provision" of Section 3553(a) states that "[t]he court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2) of this subsection."  The Third Circuit has held that "district judges are not required by the parsimony provision to routinely state that the sentence imposed is the minimum sentence necessary to achieve the purposes set forth in § 3553(a)(2). . . . '[W]e do not think that the "not greater than necessary" language requires as a general matter that a judge, having explained why a sentence has been chosen, also explain why some lighter sentence is inadequate.'"  United States v. Dragon, 471 F.3d 501, 506 (3d Cir. 2006) (quoting United States v. Navedo-Concepcion, 450 F.3d 54, 58 (1st Cir. 2006)).

of Luchko's behavior.  Without question, as the examiner concluded, Luchko is a dependent

and needy person, who found in the Fumo office the "family" and acceptance he sought.

Combine Luchko's craving for friendship, his need to please, and his diligence and

competence, and Luchko's criminal conduct transpired.

Thus, it seems clear that Luchko would not have engaged in criminal conduct

when he did had he not simply picked the wrong father figure, who ruthlessly exploited

Luchko's devotion and directed Luchko to engage in criminal acts.  That, perhaps, is a

mitigating factor, but it does not afford full comfort.  The fact remains that Luchko's trait

of passionate loyalty led him without hesitation to commit daily criminal acts.  Even when

those crimes were exposed, Luchko remained devoted to Fumo and the other Fumo

supporters who had abetted these crimes, as is evident in Luchko's belatedly discovered e-

mails and postings.  Such a tendency of devotion to a criminal Svengali must be punished

and deterred, lest it recur the moment Luchko elects to befriend and follow a new leader.

Dr. Patapsis' opinion that Luchko has, in fact, truly accepted responsibility

for his offenses is directly at odds with Luchko's repeated actions and words throughout

the period after he pled guilty, from August 2008 through January 2009, and is, instead,

merely consistent with his belated recognition of the fact that he has put himself in a very

difficult situation as his sentencing approaches.  While Luchko surely now regrets the fact

that his stubborn loyalty and foolish devotion to Fumo and the Fumo "family" have cost him

the opportunity to receive any of the potential benefits of his cooperation plea agreement

with the government, that is not "acceptance of responsibility" within the meaning of

U.S.S.G. § 3E1.1 and the Third Circuit cases that have interpreted that guideline section.

   A sentence of incarceration is also important in this case to deter others.

Public office is a public trust, and those who endeavor to serve the public must be held

accountable for acts of self-enrichment.  What happened in this case is simply outrageous -

- in response to a proper federal investigation, Luchko engaged in a wholesale purging of

public records material to the investigation.  It is essential in this case, which has received

enormous publicity, that public employees and ordinary citizens alike see that the justice

system will not tolerate such an outrage, and that such conduct will meet stern punishment.

The sentence imposed must clearly demonstrate that no one is above the law, and that

public employees may not obstruct justice to protect corrupt public officials such as Fumo.

One of the considerations of sentencing -- "to promote respect for the law," 18 U.S.C. §

3553(a)(2)(A) -- is vitally significant in this case.

   In seeking leniency, Luchko also cites the condition of his 82-year-old

mother, with whom Luchko lives and who he assists with her daily needs.  However, as the

presentence report notes, Luchko has a brother who also lives in the area.  Luchko has not

met his burden to establish that he is indispensable in his mother's care; rather, it appears

that she has family support and other resources for any necessary care.  Undoubtedly, her

life would be impacted by Luchko's incarceration, as is regrettably often the case with

regard to family members when one elects to engage in criminal activity.

In sum, the government does not recommend harsher punishment based on Luchko's actions following his plea and during the trial, but also, because of the severity and persistence of Luchko's offenses, opposes further leniency.  On balance, as the Probation Office also recommended, a sentence within the advisory guideline range of 30 to 37 months' imprisonment is appropriate.

Respectfully submitted,

LAURIE MAGID
United States Attorney


*/s/ John J. Pease*
JOHN J. PEASE
Assistant United States Attorney


*/s/ Robert A. Zauzmer*
ROBERT A. ZAUZMER
Assistant United States Attorney

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on the date shown below, I have caused this sentencing memorandum to be electronically filed with the Clerk of Court, resulting in an e-mail copy being sent to all counsel of record for all defendants.  A copy of this pleading was also sent to counsel on this date by direct e-mail, to the following:


James C. Schwartzman, Esquire
Stevens & Lee
1818 Market Street
29th Floor
Philadelphia, PA  19103



*/s/ John J. Pease*
JOHN J. PEASE
Assistant United States Attorney


Date: <u>May 18, 2009</u>.